FILED

NOV 05 2025

JOAN KANE, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
BY _____, DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

KONRAD TADEUSZ PATRZALEK,
also known professionally and operationally as **KORNELIUS KONG ("King Kong")**,
*Plaintiff, sui juris,*
proceeding *pro se* and hereinafter also referred to as "Affiant,"

v.

**'THE FINANCE CARTEL'; ELON MUSK; X CORPORATION; DEPARTMENT OF GOVERNMENT EFFICIENCY (D.O.G.E); TIKTOK; DONALD J. TRUMP; BENJAMIN NETANYAHU; VLADIMIR ZELENSKYY; MEMBERS OF THE ROTHSCHILD BANKING DYNASTY; MEMBERS OF THE ROCKEFELLER FAMILY; AIPAC; LARRY ELLISON; LARRY SILVERSTEIN; DEPARTMENT OF DEFENSE (PENTAGON); CENTRAL INTELLIGENCE AGENCY (CIA); UNITED STATES CONGRESS; UNIT 8200; MOSSAD; VATICAN / IOR / BANK OF AMERICA; LEADERS OF THE EUROPEAN UNION AND AFFILIATED AGENCIES (BRUSSELS ENTERPRISE); MARK CARNEY; RED ROCK BEHAVIORAL HEALTH SERVICES; MICHAEL SAYLOR; JEB MCCALEB; TIM DRAPER; CHANGPENG ZHAO (CZ); RICHARD TENG / BINANCE; BRIAN ARMSTRONG / COINBASE; DAVE RIPLEY / KRAKEN; STAR XU / OKX; BEN ZHOU / BYBIT; CAMERON & TYLER WINKLEVOSS / GEMINI; VITALIK BUTERIN; ANDREESSEN HOROWITZ (A16Z); BORED APE YACHT CLUB / YUGA LABS; STRIPCHAT.DE; EPOCH LLC; WATCHERGURU; GLOBAL PRIVATE INTELLIGENCE CONTRACTORS (E.G. SAIC, PALANTIR, BOOZ ALLEN); U.S. DEFENSE CONTRACTORS (RAYTHEON, LOCKHEED, NORTHROP GRUMMAN, ETC.); MICROSOFT CORPORATION (PEGASUS-BACKDOOR); JPMORGAN CHASE & CO.; DEUTSCHE BANK; U.S. BANCORP (UNITED STATES INC.); BLACKROCK INC.; THE VANGUARD GROUP INC.; STATE STREET CORPORATION; BANK OF ENGLAND; BANK FOR INTERNATIONAL SETTLEMENTS (BIS); THE INTERNATIONAL MONETARY FUND (IMF); THE WORLD BANK; THE WORLD ECONOMIC FORUM (WEF); THE CITY OF LONDON; UNITED ARAB EMIRATES; NORTH ATLANTIC TREATY ORGANIZATION (NATO); TRANSNATIONAL AND CYBER-ORGANIZED CRIME NETWORKS; TRIAD CRIMINAL SYNDICATES; YAKUZA FACTIONS; ISRAELI ORGANIZED CRIME NETWORKS; UKRAINIAN ORGANIZED CRIME NETWORKS; THE CRYPTODICKBUTT REGIME (CYBER GANG NETWORK); TOGETHER WITH UNKNOWN CO-CONSPIRATORS (John and Jane Does / Corporations 1–50), collectively forming an association-in-fact enterprise under 18 U.S.C. § 1961(4).**

*Defendants.*

---

Civil Action No. _____
**VERIFIED CIVIL RICO COMPLAINT**
*(18 U.S.C. §§ 1961–1968; Civil Rights; International Human-Rights Violations)*

# Introductory Statement

Plaintiff **Konrad Tadeusz Patrzalek**, *sui juris* (hereinafter "Affiant"), brings this verified civil action under the **Racketeer Influenced and Corrupt Organizations Act** (18 U.S.C. §§ 1961–1968), the **U.S. Constitution**, applicable **state-law causes of action**, and **customary and treaty-based international law**.

Plaintiff alleges that the Defendants collectively form an **association-in-fact enterprise—***the Finance Cartel*—composed of governmental, financial, corporate, media, and intelligence actors who have engaged in a continuing pattern of racketeering activity spanning the United States and foreign jurisdictions.

This enterprise, fully aware of Plaintiff's identity and investigative work, has undertaken a sustained campaign to suppress, discredit, and neutralize him because his research and whistleblowing threatened to expose its money-laundering, human-trafficking, child-trafficking, capital-flight, and war-profiteering operations.

Plaintiff's **UNIKORNAIO** investigative framework uncovered how the concealment of material economic information regarding capital flight through unregulated digital-asset markets functions as a primary driver of inflation and global instability—a fact known to Defendants but deliberately hidden to preserve illicit profits.

As a direct and proximate result of Plaintiff's lawful whistleblowing, investigative reporting, and efforts to expose the Defendants' corruption, money-laundering, and trafficking operations, Plaintiff suffered severe **reputational, economic, and emotional harm**. Defendants and their agents engaged in retaliatory acts—including coordinated **defamation, digital sabotage, economic interference, and harassment campaigns**—intended to destroy Plaintiff's credibility, isolate him professionally, and suppress his investigative findings.

These injuries constitute compensable damages under the civil provisions of **RICO (18 U.S.C. § 1964(c))**, which grants standing to "[a]ny person injured in his business or property by reason of a violation of section 1962." Plaintiff's injuries were neither speculative nor incidental but the direct consequence of Defendants' racketeering scheme to conceal systemic corruption and silence lawful exposure thereof.

Plaintiff is a **U.S. citizen and investigative professional** whose exposure of these networks resulted in retaliation, defamation, and economic sabotage. This action seeks **compensatory, statutory, and treble damages under RICO**; **declaratory and injunctive relief** to halt ongoing retaliation and enterprise operations; and **recognition of Plaintiff's rights under U.S., state, and international law**.

Filed in the public interest, this Verified Complaint seeks to **safeguard the rule of law** and **hold accountable** those who, acting under color of authority or corporate influence, have corrupted global financial and humanitarian systems for private gain.

# Citizen Submission Authority and Necessity of Civil Action

Plaintiff appears as a private citizen and affiant under **18 U.S.C. § 3332(a)**, which empowers any person possessing evidence of federal offenses to request that such evidence be presented to a special grand jury through the United States Attorney. Pursuant to this statutory authority, Plaintiff sought to provide documentation of organized criminal activity, racketeering, and associated predicate acts to federal authorities in good faith.

However, due to the **slander, defamation, digital interference, and coordinated obstruction** orchestrated by the Enterprise and its affiliates, Plaintiff was systematically prevented from exercising that right. This deliberate campaign of **reputational destruction and interference** effectively barred Plaintiff's access to proper prosecutorial channels, leaving no viable avenue for grand-jury submission or law-enforcement cooperation.

Plaintiff's damages stem not from ordinary disputes but from **organized, retaliatory actions** executed by the Enterprise in response to his lawful investigative activity. Having been **defamed, deplatformed, economically targeted, and digitally obstructed**, Plaintiff's capacity to sustain his livelihood and professional reputation was intentionally sabotaged. This pattern of retaliation, undertaken to prevent disclosure of material evidence, establishes the **causal nexus required for civil RICO relief.**

Accordingly, this Civil RICO action arises as the lawful and necessary vehicle through which Plaintiff now seeks judicial redress, discovery, and exposure of the continuing racketeering enterprise. The inclusion of **§ 3332(a)** affirms both Plaintiff's **standing** and his **good-faith intent** to pursue justice through every lawful means available when governmental channels have been obstructed by the very enterprise under investigation.

# II. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction pursuant to **18 U.S.C. §§ 1961 – 1968** (Racketeer Influenced and Corrupt Organizations Act), **28 U.S.C. § 1331** (federal-question jurisdiction), and 2**8 U.S.C. § 1343(a)(3)**, **in conjunction with 42 U.S.C. § 1983,** for civil-rights violations committed under color of state law. This Court also has jurisdiction pursuant to **18 U.S.C. § 1964(c),** which provides a private right of action for any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962. Jurisdiction is further supported by 28 U.S.C. § 1350 (Alien Tort Statute) insofar as the conduct alleged constitutes violations of international human-rights norms actionable under U.S. law. Collectively, these provisions confer jurisdiction over federal RICO claims, civil-rights deprivations, and associated predicate offenses arising under the Constitution and laws of the United States.

2. Supplemental jurisdiction exists under **28 U.S.C. § 1367(a)** for all state-law claims arising from the same nucleus of operative facts, including defamation, intellectual-property theft, conversion, civil conspiracy, and related torts.
Diversity jurisdiction also lies under **28 U.S.C. § 1332(a)** because the parties are citizens of

different states and foreign jurisdictions, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. **Personal Jurisdiction.** Each Defendant transacts business within the United States and has directed acts toward this District or caused injury to property and persons located here. Exercising jurisdiction comports with due process under **U.S. Const. amend. XIV** and **Fed. R. Civ. P. 4(k)** because Defendants maintain continuous and systematic contacts with the forum through financial institutions, digital-asset platforms, lobbying networks, and communications affecting Oklahoma residents. Defendants have purposefully availed themselves of the privileges of conducting activities within this forum by targeting Plaintiff's investigative and commercial activities through coordinated online operations, financial interference, and defamation campaigns directed toward Oklahoma. These actions constitute *minimum contacts* under *International Shoe Co. v. Washington,* 326 U.S. 310 (1945), and *effects* within the forum under *Calder v. Jones,* 465 U.S. 783 (1984), thereby making the exercise of personal jurisdiction reasonable and consistent with traditional notions of fair play and substantial justice.

4. **Foreign Jurisdiction Extension.**
To the extent that foreign sovereigns, agencies, or actors—including but not limited to **Mossad, EU, NATO, and associated Israeli and Ukrainian intelligence or military entities**—are named herein, jurisdiction is asserted solely for **ultra vires** and **commercial conduct** undertaken outside any lawful sovereign authority. Such acts fall within the **commercial-activity and tort exceptions** of the **Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(2)–(a)(5))** and are therefore subject to adjudication in this Court. These entities are alleged to have engaged in commercial, for-profit, or coercive digital-asset operations directed toward the United States and this District, constituting conduct that lies beyond any protected sovereign capacity and within the scope of U.S. jurisdiction under the **Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968).**

5. **Venue.** Venue is proper in the **United States District Court for the Western District of Oklahoma** under **28 U.S.C. § 1391(b)** and **18 U.S.C. § 1965(a)** because a substantial portion of the acts and omissions giving rise to this Complaint—including retaliatory conduct, defamation, cyber intrusions, and efforts to suppress Plaintiff's exposure of the Enterprise's child-trafficking and laundering operations—occurred or were directed here, and the resulting economic and reputational injury was suffered by Plaintiff while domiciled in this District.
The Western District of Oklahoma is also where Plaintiff maintains residence, conducts his investigative work, and experienced the most direct effects of the racketeering enterprise. Filing here serves the **interests of justice.**

6. **State Jurisdiction – Cooperative Federalism and Enforcement Authority.** The several States of the United States retain concurrent criminal jurisdiction over predicate acts constituting racketeering, fraud, human trafficking, and related offenses under state RICO statutes and penal codes. Pursuant to principles of cooperative federalism and under 18 U.S.C. § 1961 et seq., coordination between federal and state law enforcement agencies—including State Attorneys General, State Bureaus of Investigation, and local prosecutorial task forces—is authorized for

the enforcement of joint RICO, anti-trafficking, and organized crime statutes. Many of the predicate offenses alleged herein implicate both federal and state elements; thus, this Complaint recognizes the lawful concurrent jurisdiction of state authorities and their cooperation through the National Fusion Center Network, the National Association of Attorneys General (NAAG), and intergovernmental data-sharing protocols consistent with Executive Order 12333 and the Attorney General Guidelines.

7. **Federal Jurisdiction – FBI Mandate.** The Federal Bureau of Investigation is empowered under 28 U.S.C. § 533 to investigate offenses against the United States and, under 18 U.S.C. § 2516, to seek court-authorized interception of communications for enumerated offenses, including racketeering. As a component of the U.S. Intelligence Community, and pursuant to Executive Order 12333 and applicable Attorney General Guidelines, the FBI coordinates foreign-intelligence and law-enforcement cooperation consistent with U.S. law. Accordingly, to the extent this action is referred for criminal investigation and involves cross-border predicate acts, the FBI's investigative authority and liaison functions permit coordination with allied counterparts through established channels, including the Mutual Legal Assistance Treaties (MLATs) identified herein.

8. **Military Jurisdiction – Unified Command Authority.** The United States Armed Forces, operating under Title 10 and Title 50 of the United States Code, maintain concurrent and coordinated jurisdiction over transnational offenses implicating national defense, foreign intelligence, and military command interests. Pursuant to Executive Order 12333 and Department of Defense Directive 5240.01, the Defense Intelligence Agency (DIA), Defense Criminal Investigative Service (DCIS), and related Joint Task Forces possess investigative authority over offenses intersecting with espionage, terrorism, human trafficking, and organized criminal enterprises impacting U.S. or allied national security. Coordination with the Federal Bureau of Investigation is authorized through established Joint Terrorism Task Forces (JTTFs), Combined Task Force operations, and NATO-aligned command frameworks. Accordingly, this Complaint recognizes the lawful operational jurisdiction of the Department of Defense in parallel with the Department of Justice for purposes of integrated enforcement, intelligence coordination, and international accountability.

9. **International Police Coordination – Interpol and Global Enforcement Networks.** The International Criminal Police Organization (Interpol), established under its 1956 Constitution and recognized by the United Nations as an intergovernmental organization, provides the principal mechanism for global law-enforcement cooperation in combating transnational organized crime, terrorism, human trafficking, and financial corruption. Member states, including the United States, coordinate through the **U.S. National Central Bureau (USNCB)** located within the Department of Justice, which functions as Interpol's liaison in Washington, D.C. Pursuant to 22 U.S.C. § 263a and Executive Order 11322, U.S. participation in Interpol authorizes information sharing, notice issuance, and coordination consistent with U.S. law. Accordingly, this Complaint recognizes Interpol's jurisdictional role in facilitating cross-border enforcement and the exchange of intelligence relevant to the predicate acts described herein.

10. **International and Treaty Jurisdiction.** This Court additionally recognizes jurisdiction under applicable international conventions and customary law, including the **Geneva Conventions (1949)**, the **Universal Declaration of Human Rights**, the **Convention Against Torture**, and the **Rome Statute of the International Criminal Court**, insofar as Defendants' conduct constitutes human-trafficking, war-profiteering, or persecution of protected persons. These norms are invoked not as independent causes of action but as interpretive guidance consistent with the **Charming Betsy** canon, which instructs that U.S. law should be construed in harmony with the Nation's treaty obligations. Plaintiff does not invoke these treaties as independent causes of action but as interpretive guides consistent with U.S. obligations under customary international law and the Alien Tort Statute, 28 U.S.C. § 1350."

11. **Foreign Evidence and Cooperation (Poland and Russia).** Plaintiff further notes that relevant evidence and witnesses exist within the territories of **Poland** and the **Russian Federation**, both of which maintain established cooperative channels with the United States through bilateral **Mutual Legal Assistance Treaties (MLATs)** and extradition agreements. Plaintiff requests that any investigation or enforcement arising from this action utilize those official channels for lawful evidence gathering, preservation, and coordination with authorized Polish and Russian **law** enforcement authorities.
The Russian Federation is referenced herein **not as a defendant**, but as a cooperating jurisdiction and a source of documentary and testimonial evidence that has already disclosed truthful information regarding the Enterprise's financial and trafficking operations. Inclusion of this reference ensures a full and fair adjudication of the issues presented and promotes judicial comity in the administration of international law.

12. **Pendent-Party Jurisdiction.** The Court may exercise pendent-party jurisdiction over additional co-conspirators and foreign participants in the enterprise whose conduct forms part of the same pattern of racketeering activity, pursuant to **18 U.S.C. § 1965(b),** Jurisdiction over foreign sovereign defendants is asserted pursuant to 28 U.S.C. § 1605(a)(2) (commercial activity exception) and § 1605A (tort exception), as their conduct was commercial, for-profit, and outside any lawful sovereign authority.

13. Accordingly, this Court possesses **federal, supplemental, diversity, personal, RICO-specific, and treaty-based jurisdiction** to adjudicate the civil-RICO, civil-rights, and ancillary state-law claims asserted herein and to grant equitable and declaratory relief necessary to remedy continuing violations of United States and international law.

14. **Jurisdictional Integration and Necessity.** Plaintiff expressly asserts the foregoing statutory and treaty-based jurisdictional grounds in the alternative and in combination, not for redundancy but to reflect the decentralized, transnational, and multi-forum structure of the enterprise described herein. Because the predicate acts alleged involve coordinated conduct across domestic and foreign jurisdictions, including digital-asset markets, banking systems, and intergovernmental bodies, the assertion of overlapping jurisdictional bases is both necessary and proper to ensure that the full scope of the enterprise's activity falls within the reach of this Court Each jurisdictional statute cited—18 U.S.C. §§ 1961–1968, 28 U.S.C. §§ 1331, 1332, 1343, 1367, and 1965—corresponds to distinct categories of defendants or predicate acts that

individually or collectively establish subject-matter and personal jurisdiction. These provisions are invoked cumulatively to prevent jurisdictional failure where portions of the enterprise operate beyond a single territorial boundary and to enable comprehensive adjudication consistent with due process, the RICO statute's extraterritorial reach, and the cooperative mechanisms available under Mutual Legal Assistance Treaties (MLATs) and customary international law. This integrative approach preserves judicial economy, facilitates cross-border evidence gathering, and ensures that no participant in the alleged racketeering enterprise can evade accountability by exploiting jurisdictional fragmentation.

15. **Procedural Considerations.**

Plaintiff recognizes that defendants may raise procedural doctrines traditionally applied in matters implicating foreign affairs or sovereign conduct. These include the *Political Question Doctrine*, which Plaintiff preempts by clarifying that the issues herein concern commercial and racketeering activity—not foreign-policy decisions—and the *Act of State Doctrine*, which is inapplicable because the conduct alleged constitutes ultra vires, commercial, and criminal enterprise activity undertaken for profit. Plaintiff also affirms compliance with the *Hague Service Convention* and *Fed. R. Civ. P. 4(f)* for service of foreign defendants and includes a declaration of the intended method of service. Finally, recognizing that this is a **civil RICO** action, Plaintiff seeks only the civil remedies authorized under **18 U.S.C. § 1964(c)** and requests referral, rather than prosecution, consistent with § 1964(d). Allegations of "proxy warfare" or coordinated foreign interference are therefore pled strictly within the commercial and racketeering framework, falling squarely under this Court's jurisdiction.

16. **Educational and Clarification Purpose.**

Plaintiff further acknowledges that this Section is presented not merely to assert jurisdiction, but to assist the Court in appreciating the comprehensive statutory and treaty-based framework that Congress and the Executive have already provided for the adjudication of transnational racketeering and human-rights violations. Given the evolving nature of digital-asset markets, cross-border financial flows, and multi-jurisdictional criminal enterprises, Plaintiff respectfully submits that this Complaint serves an educational and clarificatory function—demonstrating how existing federal statutes, including RICO, § 1983, and the Foreign Sovereign Immunities Act's commercial-activity and tort exceptions, collectively empower this Court to exercise its lawful authority. The intent is not to expand judicial power beyond its constitutional limits, but to illuminate the breadth of jurisdiction that Congress has expressly conferred, ensuring that the Court, as guardian of the rule of law, can address the full scope of the enterprise's conduct in conformity with due process and international comity.

# III. PARTIES

## A. Plaintiff

1. **Konrad Tadeusz Patrzalek** ("Plaintiff"), *sui juris* (hereinafter also "Affiant"), is an adult resident of United States jurisdiction, domiciled in Oklahoma. He proceeds *pro se* and brings this Verified Civil RICO Complaint on his own behalf and in the public interest.

2. Plaintiff is also known professionally and operationally as **Kornelius Kong** ("King Kong"). The alias *Kornelius Kong* is widely recognized within political, elite, and Web3 sectors and is used in coordination with Plaintiff's legal name for professional, operational, and investigative purposes. The origin, history, and professional use of this alias are described in **Exhibit King Kornelius Kong**, which is attached hereto and incorporated by reference. That exhibit details the development of the alias during Plaintiff's incarceration, its evolution through Plaintiff's operational work in Web3 and human-trafficking investigations, and its recognition among elite, law enforcement and political networks.

3. Plaintiff employs this alias in connection with his professional and investigative work to ensure accurate identification within sectors where operational pseudonyms and digital handles are standard. The inclusion of this alias does not constitute a nickname or diminishment of Plaintiff's legal identity but reflects established operational and professional recognition.

4. Plaintiff is an investigator and whistle-blower whose **UNIKORNAIO / Men In Black Initiative** investigative framework uncovered large-scale capital-flight, money-laundering, and human-trafficking operations carried out through digital-asset systems. As a direct result of exposing and documenting these activities, Plaintiff has suffered severe financial, reputational, and constitutional injury, including targeted defamation, suppression of protected speech, and retaliation by participants in the enterprise described herein.

## B. Defendants

6. **THE FINANCE CARTEL (Association-in-Fact Enterprise)** — Plaintiff alleges that all named Defendants collectively constitute an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4). Acting in concert, they operated as an organized network for the common purpose of obtaining unlawful financial and political advantage through a continuing pattern of racketeering activity. The enterprise's objectives included money laundering, wire fraud, human trafficking, child trafficking, misappropriation of intellectual property, defamation employed as obstruction, dissemination of false statements, illicit capital extraction, war profiteering, debt bondage, economic sabotage, and obstruction of justice. Each Defendant, directly or indirectly, participated in the conduct of the enterprise's affairs through one or more of these predicate acts, or by aiding, abetting, facilitating, concealing, or conspiring in their commission.

- **Members of the Rothschild banking dynasty**

- **Members of the Rockefeller family**

- **Donald J. Trump**

- **Benjamin Netanyahu**

- **Elon Musk**

- **X Corporation**

- **Department of Government Efficiency (D.O.G.E)**

- **Tiktok**
- **Larry Ellison**
- **Andreessen Horowitz (a16z)**
- **Richard Teng / Binance**
- **Brian Armstrong / Coinbase**
- **Dave Ripley / Kraken**
- **Star Xu / OKX**
- **Ben Zhou / Bybit**
- **Cameron & Tyler Winklevoss / Gemini**
- **Vladimir Zelenskyy**
- **AIPAC**
- **Unit 8200**
- **Vatican / IOR / Bank of America**
- **Mossad –** limited to non-sovereign and ultra vires conduct
- **Leaders of the European Union and affiliated agencies (Brussels Enterprise)**
- **Mark Carney**
- **Red Rock Behavior Health Services**
- **Michael Saylor**
- **Jeb McCaleb / Ripple Labs**
- **Tim Draper / Ripple Labs**
- **Changpeng Zhao (CZ)**
- **Vitalik Buterin**
- **WatcherGuru**
- **Global Private Intelligence Contractors (e.g. SAIC, Palantir, Booz Allen)**
- **U.S. Defense Contractors (Raytheon, Lockheed, Northrop Grumman, etc.)**
- **Microsoft Corporation**
- **JPMorgan Chase & Co.**
- **Deutsche Bank**
- **NVIDIA**
- **U.S. Bankcorp (UNITED STATES INC.)**

- **BlackRock Inc.**

- **The Vanguard Group Inc.**

- **State Street Corporation**

- **Bank of England**

- **Bank for International Settlements (BIS)**

- **The International Monetary Fund (IMF)**

- **The World Bank**

- **The World Economic Forum (WEF)**

- **The City of London (London Company)**

- **UNITED ARAB EMIRATES**

- **NATO** – named for ultra vires and commercial conduct only

- **Stripchat.de**

- **EPOCH LLC**

- **Bored Ape Yacht Club / Yuga Labs**

- **Members of Congress and Congressional Staff (Individual-Capacity Defendants)**
  Plaintiff asserts claims against individual Members of Congress, staff, and associated committee personnel in their *individual capacities* for acts undertaken in a commercial, proprietary, or ultra vires capacity—specifically, actions involving financial inducements, lobbying exchanges, or quid-pro-quo legislation exceeding lawful legislative authority. These claims concern enterprise-driven conduct executed by individual Members and staff acting under color of office but outside constitutional mandate. Plaintiff asserts that such acts constitute racketeering, bribery, and obstruction within the meaning of 18 U.S.C. § 1961 et seq., and that the institutional framework of Congress was used as a conduit for private or corporate enrichment. This filing does not impugn legitimate legislative functions but seeks accountability for monetized influence and extra-legal enterprise conduct. Plaintiff further acknowledges that certain Members and staff appear to have acted conscientiously to preserve constitutional integrity and may possess material evidence of the schemes described herein. No claim is asserted against the United States Congress as an institution or against the United States itself.

- **Department of Defense Personnel (Individual-Capacity Defendants)**
  Plaintiff asserts claims against officers, employees, contractors, and affiliates of the Department of Defense ("DoD") acting in their *individual capacities* for conduct undertaken in a commercial, proprietary, or ultra vires capacity—that is, acts exceeding lawful sovereign authority or involving commercial, financial, or operational behavior beyond the scope of official duties. Plaintiff alleges that certain individuals or subdivisions operating under the DoD's umbrella engaged in or facilitated activities constituting racketeering, financial misconduct, or obstruction within the meaning of 18 U.S.C. § 1961 et seq. These claims do not

challenge legitimate military or national-defense functions but concern extra-legal and profit-oriented conduct allegedly executed by or through actors embedded within the Department's administrative or contractor systems. Plaintiff further states, based on experience and observation, that some personnel within the DoD appear to have acted in ways consistent with protecting lawful process or mitigating harm, suggesting that cooperative or conscientious actors may exist within the agency who are aware of the broader circumstances described herein. No claim is asserted against the United States or the Department of Defense as sovereign entities.

- **Central Intelligence Agency Personnel (Individual-Capacity Defendants)**
  Plaintiff asserts claims against officers, employees, contractors, and affiliates of the Central Intelligence Agency ("CIA") acting in their *individual capacities* for conduct undertaken in a commercial, clandestine, or ultra vires capacity, distinct from the Agency's lawful sovereign intelligence functions. Plaintiff alleges that individuals operating under or in association with the CIA participated in financial, technological, or psychological operations amounting to racketeering, human trafficking, or interference with civil rights, conducted outside lawful authorization or oversight. These claims are directed at the enterprise activities of individuals acting under color of agency, not at the CIA's legitimate national-security missions. Plaintiff further notes that, given the level of non-obstructive assistance and situational awareness encountered during the events at issue, it is reasonable to believe that certain individuals within or adjacent to the Agency have recognized the seriousness of the matters alleged and may have acted discreetly to preserve evidence or prevent further harm. No claim is asserted against the United States or the CIA as sovereign entities.

- **Transnational and Cyber-Organized Crime Networks** – Including but not limited to the Triad criminal syndicates, Yakuza factions, Israeli organized crime networks, Ukrainian organized crime networks, and the Cryptodickbutt Regime (Cyber Gang Network), each of which operates as a coordinated transnational structure engaged in racketeering and commercial criminal activity that transcends national borders. These entities function as financial, technological, and logistical conduits within the larger association-in-fact enterprise known as the Finance Cartel facilitating laundering, trafficking, extortion, and coercive influence through digital assets, offshore accounts, and commercial fronts.

- **Triad Criminal Syndicates** – Transnational organized crime networks originating in Hong Kong, Macau, and mainland China, alleged to have engaged in money laundering, human trafficking, narcotics trade, digital-asset manipulation, and extortion as part of the broader enterprise. These syndicates are identified as operating beyond any lawful sovereign authority and are included for their role in channeling illicit funds, trafficking proceeds, and data assets through offshore financial havens and cryptocurrency exchanges. Their conduct constitutes commercial and ultra vires activity, actionable under 18 U.S.C. §§ 1961(1), 1962(c)–(d) and 28 U.S.C. § 1605(a)(2) (commercial-activity exception).

- **Cryptodickbutt Regime (Cyber Gang Network)** refers to a transnational network of cyber-enabled actors, online gangs, and associated platform accounts alleged to have engaged in coordinated digital racketeering activity in support of the Finance Cartel enterprise. This

network is alleged to have participated in, facilitated, and materially supported predicate acts including computer intrusion, data ex-filtration, ransomware and extortion schemes, identity theft, coordinated online disinformation campaigns, fraudulent token issuances, crypto-asset laundering, and obstruction of investigative activities. Operating through digital-asset infrastructures, anonymous exchange accounts, social-media sock-puppet networks, and encrypted communications channels, the Cryptodickbutt Regime conceals the origin of illicit funds while suppressing and intimidating witnesses and investigators. Its conduct constitutes commercial and ultra vires activity, actionable under **18 U.S.C. §§ 1961(1), 1962(c)–(d)** and, where applicable, **28 U.S.C. § 1605(a)(2)** (commercial-activity exception). As detailed in *Exhibit: Origin of the Security Threat Group (STG) Classification Name "Cryptodickbutts"*, the individuals and entities who now fall under this classification **chose and affirmed the name "Cryptodickbutts" themselves**, publicly and collectively, while engaging in conduct that met the threshold for organized digital threat group designation. The title was not externally imposed but **arose organically through the subjects' own mockery and self-identification** during investigative contact. The name's vulgar and absurdist tone accurately reflects the group's behavior—rooted in trolling culture, coordinated harassment, and deliberate criminal parody. Accordingly, the use of the term "Cryptodickbutt Regime" within this filing is not rhetorical but **descriptively accurate and evidentiary in nature**, signifying a self-adopted moniker consistent with their documented conduct and communications. The name itself serves as proof of the criminal culture underlying the Web3 ecosystems investigated—embodying the normalization of gang behavior, racialized threats, and digital anarchy disguised as humor or internet culture. Specific transactions, account identifiers, communications logs, and technical indicators demonstrating the Cryptodickbutt Regime's role in the enterprise are set forth in the Master Matrix and accompanying Exhibits, incorporated herein by reference.

- **Affiliation and Operational Integration** – The foregoing entities and networks, including the Triad Criminal Syndicates, Yakuza factions, Israeli organized crime networks, Ukrainian organized crime networks, and the Cryptodickbutt Regime, do not act autonomously but operate as **subordinate instrumentalities and enforcers** within the broader association-in-fact enterprise composed of the named Defendants. Their conduct constitutes the **operational arm** of the racketeering network—executing illicit directives, maintaining coercive control, and enforcing compliance through intimidation, disinformation, cyber interference, and financial coercion. Each group acts as an **agent, contractor, or proxy** of the principal Defendants— including corporate, institutional, and state-affiliated participants—and is therefore **jointly and severally liable** under **18 U.S.C. § 1962(c)–(d)** and established **agency principles** for acts undertaken in furtherance of the enterprise. This alignment demonstrates that the transnational criminal organizations and cyber-actor networks identified herein function not as independent criminals but as **extensions of the greater enterprise**, materially advancing its objectives through coordinated racketeering, propaganda, financial manipulation, and suppression operations directed by and benefiting the other Defendants.

- **John and Jane Doe Defendants & Corporations**

"John and Jane Does 1–50," together with unnamed corporate and institutional affiliates (the "Doe Corporations"), are individuals, partnerships, limited-liability companies, financial institutions, lobbying groups, media outlets, and technology platforms whose exact identities and legal structures are presently unknown to Plaintiff. These Doe Defendants participated directly or indirectly in the racketeering enterprise described in this Complaint by providing financing, digital-asset infrastructure, lobbying services, data access, propaganda dissemination, or other material support to the association-in-fact enterprise known as the *Finance Cartel*. Each Doe Defendant is believed to have acted individually and in concert with the named Defendants and is **jointly and severally liable** for the predicate acts of the enterprise under **18 U.S.C. § 1962(c)–(d)**, as well as under the doctrines of **aiding and abetting**, **respondeat superior**, and **agency**. Plaintiff will amend this Complaint to substitute their true names and corporate Identities once discovered.

7. Defendants acted in concert under a unified scheme to conceal criminal enterprise activities, suppress disclosures, and preserve unlawful financial gain at the expense of the economy.

• Concealed material economic information regarding the mechanisms of **capital flight via unregulated digital assets**, a hidden primary driver of inflation and global instability.

• Concealed material economic information regarding the mechanisms of **defense-sector capital flight** through inflated contracting, layered subcontracting, and off-budget procurement channels—an unregulated driver of fiscal distortion, debt expansion, and geopolitical instability.

• **Laundered and embezzled funds** through digital-asset systems, offshore havens, and tokenized payment networks.

• **Financed and participated in human trafficking**, including the trafficking of women and children through tokenized transactions and non-fungible-asset structures.

• **Profited from war, reconstruction, and genocide** through bribery, lobbying funds, defense contracts, and real-estate ventures such as the *Trump Towers Gaza* project.

• Disseminated **false narratives, disinformation, and propaganda** to defame and discredit Plaintiff, obstruct investigations, and suppress witness testimony.

• Such conduct constitutes **defamation per se**, **malicious interference**, and **obstruction of justice** under **18 U.S.C. §§ 1503, 1510, and 1512**.

• Despite full awareness of Plaintiff's verified findings, Defendants **willfully continued to distort factual information** and conceal their participation in criminal activity.

• Several Defendants—having sworn oaths to uphold the **U.S. Constitution**—acted under **color of authority** while subordinating national loyalty to **foreign powers and financial interests**.

• Evidence demonstrates subjugation to **Rothschild-affiliated banking and political influence**, specifically under **Benjamin Netanyahu's leadership**, establishing a pattern of foreign-directed manipulation and coercion.

- Through propaganda, blackmail, and coordinated financial operations, these actors **subverted U.S. sovereignty** and obstructed justice to preserve their transnational criminal network.

- Collectively, such acts constitute **racketeering, obstruction, and treasonous coordination with foreign powers**, undermining the security and governance of the United States.

8. **Legal Responsibility for Subordinates' Acts and Omissions:** Plaintiff acknowledges limited access to discovery identifying the specific subordinate or proxy actors who executed retaliatory, coercive, or otherwise unlawful acts against him. Nonetheless, the named Defendants — as heads, officers, or controlling principals of the implicated nations, agencies, corporations, crypto exchanges, alpha groups, secret societies, or lobbying entities — bear *strict, vicarious, and constructive liability* for those acts. Under the doctrines of *respondeat superior, aiding and abetting, conspiracy,* and *joint and several liability,* they are legally accountable for the conduct, omissions, and material gains derived from the acts of their agents, employees, and co-conspirators, particularly where such acts were undertaken for their benefit, under their authority, or in furtherance of the enterprise. See *18 U.S.C. §§ 1962(c)-(d)* (RICO liability for any person associated with an enterprise), and *Restatement (Second) of Agency §§ 219–220* (principal's liability for agent's acts).

   Moreover, Defendants' continued possession, concealment, or circulation of cryptocurrency, digital assets, or capital derived from human exploitation, sex trafficking, and child trafficking constitutes direct participation in a criminal racketeering enterprise and conversion of *proceeds of human suffering* into financial instruments. By knowingly permitting and profiting from such extraction of human value into digital capital — and by remaining silent or complicit despite full awareness of its origin — the Defendants became active participants in the predicate offenses of money laundering, racketeering, and crimes against humanity. Under RICO, each member of an association-in-fact enterprise is jointly and severally liable for all predicate acts committed in furtherance of that enterprise, irrespective of which individual executed the act. Accordingly, the leaders named herein are sued in their *individual and personal capacities* for their direct and knowing participation, authorization, and benefit derived from the misconduct of their subordinates, as well as for their deliberate omission to intervene, disclose, or remedy the continuing criminal enterprise.

## C. Jurisdictional Allegations

9. The Defendants named herein reside and operate in multiple jurisdictions across the United States and throughout the world, including but not limited to North America, Europe, the Middle East, and Asia. Each Defendant either resides in, transacts business within, or has directed acts toward this District and the United States at large, and their collective racketeering and financial activities caused injury to the Plaintiff and to property located within this District. Accordingly, this Court has personal jurisdiction over all Defendants pursuant to **18 U.S.C. § 1965(a)–(b)** and **Okla. Stat. tit. 12, § 2004(F)** (Oklahoma's long-arm statute), and the exercise of such jurisdiction comports with due process under the **Fourteenth Amendment**.

### D. Immunity Exceptions and Identification of Defendants

10. Plaintiff alleges that, to the extent any Defendant is or was a public official, head of state, or senior executive of a governmental or intergovernmental entity, the conduct described in this Complaint was **not undertaken in any official governmental capacity but as part of a private, transnational racketeering enterprise** devoted to money laundering, human trafficking, corruption, and **war profiteering** carried out for personal and commercial gain.

11. Defendants personally profited from these activities through bribes, lobbying funds, defense and reconstruction contracts, and real-estate or digital-asset investments—including, among other examples, the **Trump Towers Gaza project**—which illustrate how the enterprise monetized armed conflict and humanitarian crises.

12. Far from exercising legitimate sovereign authority, many of these Defendants acted as **agents or proxies within organized handler systems,** taking direction from financiers, lobbyists, blackmailers and intelligence intermediaries. By accepting private payments and favors in connection with these ventures, they acted **for commercial enrichment rather than in the interests of the public,** thereby forfeiting any claim to sovereign or diplomatic immunity.

13. Such conduct is **ultra vires,** commercial, and criminal in nature, and falls within the exceptions to immunity established by **28 U.S.C. § 1605(a)(2)** (commercial-activity exception), **§ 1605A** (terrorism and human-trafficking exception), and **18 U.S.C. § 1595** (civil remedy for trafficking victims).

14. **Plaintiff names the heads of the implicated organizations as Defendants** because they personally orchestrated, supervised, were complicit to and profited from the conduct alleged herein, and have maintained ongoing surveillance and data collection on Plaintiff to monitor his activities and suppress disclosure of their enterprise. Although these Defendants are collectively aware of Plaintiff's investigations and the accuracy of his findings, they have nevertheless acted in concert to propagate false narratives, disinformation, and defamation about him. By using their positions of power and influence to spread knowingly false statements, they have shifted public belief toward their fabrications and away from Plaintiff's documented truths, thereby deepening his reputational and economic injuries while concealing the enterprise's operations. These individuals are sued in their individual capacities because their acts were undertaken for private, commercial, and criminal purposes—not for any legitimate governmental function— and they therefore cannot claim sovereign or diplomatic immunity.

# IV. OVERVIEW OF THE RACKETEERING ENTERPRISE (UNIKORNAIO FRAMEWORK)

1. Plaintiff alleges that the individuals and entities named in this Complaint collectively comprise a **transnational association-in-fact enterprise** (the "Finance Cartel") within the meaning of **18 U.S.C. § 1961(4).** The Enterprise operates across governmental, financial, technological, and

intelligence sectors and uses coordinated economic, digital, and psychological mechanisms to obtain unlawful enrichment and suppress exposure of its activities.

2. This Enterprise functions through an interlocking network of corporations, state actors, asset managers, and intelligence services that share information, resources, and objectives. It is not a single legal entity but an organized system of persons and institutions that **agree on a common purpose**—to control digital-asset markets, direct capital flight, and profit from human-rights abuses and global instability while concealing their activities from regulators, the public, and legitimate governments.

3. The Enterprise's operations are mapped and analyzed through Plaintiff's **UNIKORNAIO** framework, a proprietary investigative protocol developed to trace financial, cyber, and political correlations across jurisdictions. UNIKORNAIO integrates forensic accounting, blockchain tracing (out-sourced), open-source intelligence, whistle-blower accounts and behavioral-analysis techniques to expose links between digital-asset movements, lobbying efforts, and covert influence campaigns. This framework underlies the evidence summarized in the **Master Matrix and Table of Contents**.

4. Through this structure, the Enterprise conducts a **pattern of racketeering activity** within the meaning of **18 U.S.C. § 1961(5),** including but not limited to wire fraud, money laundering, obstruction of justice, human trafficking, extortion, bribery, and dissemination of false information. Predicate acts occurred continuously for more than a decade and span multiple nations and markets, demonstrating both **relationship** and **continuity** sufficient to establish a RICO pattern.

5. The Enterprise employs coordinated mechanisms of control:
a. **Financial coordination** – use of unregulated digital-asset exchanges, hedge-fund conduits, and off-shore vehicles to launder proceeds and engineer capital flight that distorts inflationary data;
b. **Information coordination** – use of intelligence agencies, private contractors, and social-media platforms to surveil, censor, and defame investigators and whistle-blowers;
c. **Political coordination** – deployment of lobbying groups, think tanks, and corporate donations to influence legislation and obstruct oversight, including sabotage of FIT21 and related digital-asset reform efforts;
d. **Cultural and psychological coordination** – execution of targeted disinformation and entertainment-based propaganda campaigns designed to normalize corruption and discredit dissent; and (Section FU)
e. **Enforcement coordination** – use of private security, intelligence "handler" systems, and coercive leverage over compromised officials to maintain silence and ensure loyalty within the network.

6. Each Defendant identified in the Matrix participated in or benefited from one or more of these mechanisms. Because the Enterprise functions through mutual dependency, **acts committed by any member further the objectives of all members**, rendering every participant jointly and severally liable under **18 U.S.C. § 1962(c) and (d)**.

7. The UNIKORNAIO findings, as organized in the **Master Matrix and Table of Contents**, provide a comprehensive roadmap of the Enterprise's hierarchy, geographic reach, predicate acts, and evidentiary exhibits. These materials are incorporated by reference as though fully set forth herein and will be supplemented through discovery.

## VI. Factual Allegations (Incorporation by Reference)

Plaintiff incorporates by reference each Section, Exhibit, and Affidavit listed in the attached Master Table of Contents and Predicate-Act Cross-Reference Matrix, which together constitute the evidentiary and narrative foundation of this Complaint. Each referenced document forms part of the factual record establishing enterprise structure, continuity, and predicate acts under 18 U.S.C. §§ 1961 through 1968.

Given the extraordinary volume and sensitivity of the incorporated materials, Plaintiff respectfully requests that the Court consider all referenced Sections (A through FZ), Special Sections, and Exhibits (as indexed) as the controlling factual narrative of this action. For the sake of clarity and judicial economy, summarized descriptions of each are provided within the Master Table of Contents, while the complete texts, evidentiary files, and authenticated exhibits are maintained at the Plaintiff's official evidentiary repository:

**https://rico.houseromanov.com user:okcourts password:oklahomathunder**

This repository is maintained for the exclusive use of the Court, authorized agencies, and is available for public or in-camera review at the Court's discretion.

## VII. PATTERN OF RACKETEERING ACTIVITY

1. Plaintiff incorporates by reference all preceding paragraphs and the exhibits listed in the **Master Matrix and Table of Contents**.
   The conduct described therein constitutes a continuing **pattern of racketeering activity** within the meaning of **18 U.S.C. § 1961(5)**, involving numerous related predicate acts that share the same or similar purposes, participants, victims, and methods of commission and present a threat of continued criminal activity.

2. The predicate acts committed by members of the association-in-fact enterprise include, without limitation:

a. **Wire Fraud (18 U.S.C. § 1343):** Use of interstate and international communications—including encrypted messaging platforms, social-media channels, and digital-asset exchanges—to transmit false or misleading statements, manipulate markets, and solicit investments under fraudulent pretenses. The fraud furthered the concealment of capital flight and misrepresented economic conditions to investors, regulators, and the public.

b. **Money Laundering (18 U.S.C. §§ 1956–1957):** Conversion of illicit proceeds through unregulated digital-asset exchanges, off-shore shell entities, and correspondent banking systems to disguise

ownership, origin, and control. Matrix sections "Engineered Capital Flight" and "Inflation by Capital Flight" document specific flows of funds tied to these transactions.

c. **Human Trafficking (18 U.S.C. §§ 1589–1595):** Financing and facilitation of trafficking networks using cryptocurrencies and NFTs as anonymous payment mechanisms, including the exploitation of women and children identified in the "Child Trafficking in Lieu of Digital Assets" series.

d. **Obstruction of Justice and Congress (18 U.S.C. §§ 1503, 1505, 1512):** Acts designed to prevent disclosure of the enterprise's activities, including destruction of digital evidence, interference with Plaintiff's communications to regulators and legislators, and coordinated sabotage of the FIT21 legislative process.

e. **Bribery and Political Corruption (18 U.S.C. § 201 et seq.; state law corollaries):** Provision of payments, lobbying funds, and illicit favors to public officials to secure regulatory capture, market immunity, and suppression of investigations.

f. **Extortion and Economic Coercion (18 U.S.C. § 1951 – Hobbs Act):** Threats of reputational destruction, blackmail, and deprivation of access to financial infrastructure to compel silence or cooperation from witnesses, whistle-blowers, and compliant intermediaries.

g. **War Profiteering and Material Support to Crimes Against Humanity (18 U.S.C. § 2339A et seq.; international law principles):** Derivation of private profit from armed conflict, reconstruction contracts, and coordinated misinformation regarding wars and humanitarian crises, including the Gaza conflict referenced in the "Trump Towers Gaza" exhibit.

h. **Defamation and Information Laundering (18 U.S.C. §§ 1343, 1349 as wire fraud schemes):** Systematic use of digital-media platforms to spread false information about Plaintiff, suppress truthful reporting, and launder reputational damage through coordinated propaganda networks.

i. **Computer Fraud and Unauthorized Access (18 U.S.C. § 1030):** Intrusion into Plaintiff's workstations and communications through Pegasus-based and other spyware backdoors to surveil, copy, or delete proprietary data relating to the UNIKORNAIO investigation.

j. **Major Fraud Against the United States (18 U.S.C. § 1031):**
Execution of fraudulent schemes to obtain money or property from the United States government through the manipulation of public funds, federal grants, and regulatory programs. Defendants used false pretenses, misrepresentations, and digital obfuscation techniques—through shell entities, lobbying networks, and foreign intermediaries—to divert taxpayer-backed funds and mislead federal agencies. These acts constitute a coordinated effort to defraud the United States by concealing the true nature of financial flows, beneficiaries, and ownership structures tied to capital flight and digital-asset laundering mechanisms.

k. **Economic Sabotage (18 U.S.C. §§ 2332b, 2155; International Economic Security principles):**
Intentional disruption and destabilization of the U.S. economy through coordinated market manipulation, cyber interference with financial systems, and deliberate inflationary tactics using digital assets. These acts were aimed at weakening national economic security, compromising public confidence in markets, and subverting lawful government oversight. The conduct includes tampering

with financial infrastructure, inducing artificial volatility, and orchestrating capital outflows designed to erode economic stability and national sovereignty.

3. Each predicate act furthered the same overarching objective—to control global financial flows, conceal capital flight, and eliminate scrutiny of the Enterprise's operations. The acts are interrelated through shared participants, methods, and benefits, satisfying RICO's requirements of **relationship and continuity**.

4. The Enterprise's activities span at least ten years and involve thousands of transactions across multiple jurisdictions. The persistence of the same participants, the uniform use of digital-asset infrastructure, and the coordinated retaliation against investigators demonstrate a **closed-ended and open-ended pattern** of racketeering activity.

5. Pursuant to **18 U.S.C. § 1962(c)–(d)**, each Defendant is jointly and severally liable for all predicate acts committed in furtherance of the Enterprise, whether or not the individual Defendant personally executed each act. The acts described above, and in the exhibits cross-referenced in the **Master Matrix**, collectively establish the existence of an ongoing criminal enterprise engaged in a pattern of racketeering activity affecting interstate and foreign commerce.

## ENTERPRISE STRUCTURE AND SUMMARY OF RACKETEERING CONDUCT

The allegations set forth in this Verified Complaint describe a single, continuing, and integrated **racketeering enterprise** operating through the systematic exploitation of **digital-asset infrastructure, transnational capital-flight mechanisms, and affiliated financial intermediaries** to achieve unlawful economic and political objectives. Acting individually and in concert, the Defendants—comprising corporate executives, government officials, intelligence-linked operatives, and financial institutions—conducted and participated, directly and indirectly, in the affairs of this enterprise through a pattern of racketeering activity within the meaning of **18 U.S.C. §§ 1961(1) and (5)**.

The enterprise's primary function was to **launder proceeds from child trafficking, human trafficking, war profiteering, political corruption, and digital-asset fraud** through decentralized exchanges, offshore conduits, and coordinated lobbying networks, thereby concealing the origins of illicit wealth and influencing state and federal policy to preserve those channels. This conduct caused widespread and foreseeable economic harm, including **engineered inflation, market destabilization, destruction of public trust, and deprivation of both national and individual wealth**.

These harms were neither incidental nor isolated—they were the direct and intended consequences of a transnational system of digital and financial manipulation designed to extract capital from lawful economies and consolidate it under foreign, corporate, and intelligence control. Pursuant to **18 U.S.C. § 1962(c)**, each Defendant is alleged to have conducted or participated in the affairs of this enterprise through a continuous pattern of racketeering acts; and under **§ 1964(c)**, Plaintiff, as a person injured in business and property by reason of such violations, seeks treble damages, injunctive relief, and all other remedies authorized by law.

# VIII. CAUSES OF ACTION / SUMMARY OF COUNTS

Plaintiff brings this Verified Civil RICO Complaint pursuant to **18 U.S.C. §§ 1961–1968** and **18 U.S.C. § 1964(c)**, which provides a private right of action for any person injured in business or property by reason of a violation of § 1962. Each Count below incorporates all preceding paragraphs and asserts one or more violations of **§ 1962(c)** (conduct of an enterprise through a pattern of racketeering activity) and/or **§ 1962(d)** (RICO conspiracy), together with related predicate acts identified in **18 U.S.C. § 1961(1)**.

All Counts arise from a **common nucleus of operative facts** forming a unified racketeering enterprise engaged in interstate and foreign commerce through digital-asset markets, financial institutions, and coordinated lobbying systems that served as conduits for human trafficking, capital flight, and political corruption.

**Plaintiff further incorporates by reference** the entirety of this Verified Civil RICO Complaint, including all factual sections, subsections, and special investigative sections (Sections A through FZ and all supplemental or special sections), together with all attached and referenced Exhibits. These materials collectively establish the structure, continuity, and predicate acts of the racketeering enterprise described herein.

Each Count below draws upon one or more of these incorporated sections and exhibits as evidentiary foundations for the identified statutory violations under **18 U.S.C. §§ 1961–1968** (*Racketeer Influenced and Corrupt Organizations Act*) and related federal provisions, including **18 U.S.C. §§ 1341**–**1343** (*mail and wire fraud*), **§§ 1503–1513** (*obstruction and witness tampering*), **§§ 1956–1957** (*money laundering*), and **§§ 241–242** (*civil-rights violations*).

All factual allegations, predicate acts, exhibits, and investigative findings set forth throughout this Complaint are therefore deemed re-alleged and incorporated by reference into each Count as if fully stated therein.

**Interpretation of Defendant(s):**
The term **"Defendant(s)"** as used herein is intended to encompass one or more of the named defendants, as context may require. Plaintiff expressly reserves the right to attribute specific counts, acts, or omissions to particular defendants, collectively or individually, as the evidence may demonstrate. Unless otherwise indicated, the use of **"Defendant(s)"** shall not be construed to imply uniform participation by all named defendants in every alleged act, event, or count. Each count must therefore be read in the context of its specific factual allegations and incorporated references.

# Count I – Violation of 18 U.S.C. § 1962(c): Conduct of an Enterprise Through a Pattern of Racketeering Activity

Plaintiff incorporates by reference all preceding paragraphs of this Complaint.
Defendant(s) conducted and participated, directly and indirectly, in the affairs of an enterprise engaged in interstate and foreign commerce through a continuous pattern of racketeering activity that included money laundering, wire fraud, obstruction of justice, child trafficking, human trafficking, and

intimation.

These coordinated acts were undertaken to obtain unlawful financial and political advantage and to conceal the enterprise's criminal conduct. The enterprise's structure, participants, and operational hierarchy are detailed in the incorporated Sections A through FZ, Special Sections, and the Predicate-Act Cross-Reference Matrix.

By reason of Defendant(s)' violations of § 1962(c), Plaintiff suffered injury to his business, property, and professional reputation. Plaintiff seeks treble damages, costs, and equitable relief pursuant to **18 U.S.C. § 1964(c)**.

## Count II – Violation of 18 U.S.C. § 1962(d): Conspiracy to Violate RICO (Inflation Link Integrated)

Plaintiff incorporates by reference all preceding paragraphs and the entirety of Section GOP-CF (GOP Concealment of Engineered Capital Flight, Pentagon Funds & Digital Asset Bubble).

Defendant(s), including GOP leadership, affiliated operatives, financiers, and private actors such as Donald J. Trump and Elon Musk, conspired to violate 18 U.S.C. § 1962(c) by concealing material economic information essential to the stability of the U.S. economy.

Through acts of concealment, wire fraud, money laundering, and obstruction, Defendant(s) knowingly agreed to suppress evidence of at least $7 trillion USD in capital flight from regulated financial systems into unregulated digital asset markets, as detailed in Exhibits GOP-CF-1 through GOP-CF-8.

This deliberate concealment and coordinated silence directly caused and perpetuated systemic inflation, depriving policymakers, regulators, and the public of critical data needed to mitigate rising prices and liquidity contraction.

By suppressing this information, Defendant(s) intentionally manipulated economic conditions to maintain political power, protect enterprise assets, and distort monetary policy outcomes — all of which constitute predicate acts of racketeering under 18 U.S.C. § 1961(1)(B).

Each Defendant knowingly joined and advanced the conspiracy through overt acts that resulted in continuing economic, reputational, and constitutional injury to Plaintiff, including the loss of credibility, professional standing, and the inflation-driven erosion of financial stability that Plaintiff had warned against.

This ongoing enterprise constitutes a violation of 18 U.S.C. § 1962(d), forming part of the same racketeering pattern alleged throughout this Complaint. Plaintiff seeks treble damages, declaratory and injunctive relief as authorized under 18 U.S.C. § 1964(c).

## Count III – Money Laundering, Wire Fraud & Human Trafficking (Enterprise Financing Through Digital Assets and Retaliation for Exposure)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including Section FC – Money Laundering & Embezzlement, Section D – Human Trafficking and Child Exploitation, Section

CF – Engineered Capital Flight, Section Exchanges and Section CT – Child Trafficking in Lieu of Digital Assets, together with their supporting exhibits.

Defendant(s) and their affiliates operated a transnational criminal enterprise engaged in money laundering, wire fraud, conflict financing, sanctions evasion, and human trafficking through unregulated digital-asset systems and offshore intermediaries. The enterprise concealed and transferred the proceeds of trafficking, narcotics, weapons sales, political bribery, and intelligence operations through decentralized exchanges, blockchain mixers, tokenized assets, and synthetic financial instruments designed to obscure ownership and jurisdiction.

As documented in *Section Exchanges* and supporting exhibits, digital-asset exchanges knowingly enabled these crimes by allowing illicit transactions, wash trading, and obfuscated transfers to occur under their supervision. These platforms accepted high-risk deposits, turned a blind eye to politically exposed wallets, and maintained opaque relationships with offshore intermediaries that were directly tied to conflict financing, trafficking syndicates, and sanctioned entities. Internal records, whistleblower statements, and blockchain forensics revealed that several exchanges had full visibility into these illicit flows yet continued to profit from them through transaction fees, token listings, and liquidity incentives.

By deliberately neglecting compliance and Know-Your-Customer (KYC) obligations, these exchanges functioned not merely as passive conduits but as *active participants* in laundering, trafficking, and sanctions evasion networks — profiting from the very systems they were legally bound to prevent.

Enterprise participants exploited unregistered crypto platforms, NFT exchanges, stablecoin liquidity pools, and layer-2 scaling networks to wash proceeds of coercive labor, sexual exploitation, and black-market weapons trades. These systems facilitated cross-border laundering of assets originating from sanctioned states, including war zones and occupied territories, by fragmenting and reconstituting digital tokens into new custodial wallets beyond regulatory reach.

Funds were commingled with humanitarian aid channels, arms-trade settlements, and private military payrolls, constituting conflict financing in violation of 18 U.S.C. §§ 1956–1957 (money laundering), § 1343 (wire fraud), § 2339A and § 2339B (material support to terrorism and armed groups), § 1591 (sex trafficking), and §§ 1503 and 1512 (obstruction and witness tampering), all serving as predicate acts under 18 U.S.C. § 1961(1).

Through the UNIKORNAIO framework, Plaintiff identified, mapped, and documented these laundering channels, including digital "mixing" operations linking conflict-financing wallets, dark-market crypto brokers, and cross-chain bridges used by intelligence intermediaries and proxy militias. Plaintiff's disclosures to regulators, enforcement agencies, and whistleblower offices were met with orchestrated retaliation — including defamation campaigns, cyber interference, disinformation targeting, and suppression of his filings — coordinated to protect the enterprise and obstruct justice.

The enterprise used non-fungible tokens, algorithmic stablecoins, and blockchain anonymizers to disguise transfers tied to weapons procurement, organ trafficking, and political payoffs. Several of these operations were embedded within venture capital portfolios, front NGOs, and defense-sector contractors acting as intermediaries between digital-asset exchanges and sanctioned foreign entities.

This conduct also constitutes sanctions evasion under 50 U.S.C. §§ 1701–1708 (International Emergency Economic Powers Act) and 31 C.F.R. Part 594, as the enterprise circumvented U.S. Treasury restrictions through digital instruments, enabling financial support to hostile regimes, insurgent forces, and trafficking networks under the guise of legitimate fintech innovation.

By collectively engaging in suppression, defamation, and discrediting of the Plaintiff's investigative and whistleblower activities, Defendant(s) and their affiliates became complicit in the very crimes the Plaintiff sought to expose. Knowing that the Plaintiff's disclosures centered on the trafficking of children and adults in lieu of digital assets, the organized effort to silence, malign, and obstruct him constitutes conscious participation in a criminal cover-up. Their coordinated interference — including cyber manipulation, reputational sabotage, targeted harassment, and intelligence-linked censorship — was not mere negligence but a willful act to protect the enterprise's ongoing human-trafficking and money-laundering operations.

Defendant(s)' suppression of the Plaintiff's findings and communications, their deliberate distortion of his identity and credibility, and their obstruction of his regulatory and judicial filings ensured that victims of trafficking remained unprotected while illicit proceeds continued to circulate through unregulated digital-asset channels. In doing so, Defendant(s) knowingly advanced the objectives of a transnational criminal enterprise, aided and abetted ongoing violations of 18 U.S.C. § 1591 and related RICO predicate offenses, and deprived the Plaintiff of constitutional and statutory protections guaranteed to federal whistleblowers.

Such conduct demonstrates mens rea — an intentional design to conceal criminal profit mechanisms by neutralizing the individual who uncovered them. By undermining the Plaintiff's efforts to combat child and human trafficking, Defendant(s) functioned as accessories after the fact and participants in an ongoing RICO conspiracy, rendering them jointly and severally liable under 18 U.S.C. § 1962(d) for conspiracy to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.

By retaliating against Plaintiff for revealing these mechanisms, Defendant(s) engaged in obstruction of justice, witness intimidation, and retaliatory suppression, violating Plaintiff's rights as a federal whistleblower and investigator under the Men in Black Initiative. Their acts demonstrate an organized intent to maintain impunity for global trafficking, illicit finance, and covert conflict operations under a digital-asset architecture.

Plaintiff seeks treble damages under 18 U.S.C. § 1964(c), disgorgement of all illicit profits, injunctive relief dismantling the digital-asset and conflict-financing infrastructure, asset forfeiture, and full restitution for all injuries sustained as a result of Defendant(s)' retaliatory obstruction, defamation, and financial sabotage.

## Count IV – Plagiarism, Misappropriation, Digital Weaponization & Information Laundering (Intellectual Property Theft and Ethical Breach)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section PLA – Plagiarism, Digital Weaponization & Fraudulent Use of Proprietary Research, together with

supporting exhibits including *Exhibit Israel Lobby Sabotage – Deflection, Exhibit GOP Theft and Information Laundering, Exhibit Ethical Breach (Red Rock),* and *Exhibit Intellectual Property Theft Disclaimer.*

Defendant(s)—including political figures, lobbyists, and affiliated technology operatives aligned with Donald J. Trump, Elon Musk, the Cryptodickbutt Regime, and Israeli-linked lobbying networks—engaged in a coordinated campaign of theft, plagiarism, and misappropriation of Plaintiff's original investigative materials, intellectual frameworks, and proprietary digital protocols.

The stolen materials—developed under the UNIKORNAIO framework—were rebranded and redeployed to conceal enterprise crimes involving capital flight, trafficking, and sabotage of the FIT21 reform initiative. Defendant(s)' misappropriation extended to Plaintiff's proprietary (incomplete) research on Digital Voter Manipulation (DVM) and digital-asset laundering analytics, which were republished without attribution and used to mislead the public, policymakers and regulators.

When Plaintiff's research began revealing Israeli lobbying and financial manipulation networks, Defendant(s) escalated into coordinated defamation and psychological operations to discredit him publicly, labeling him "delusional" and "unfit" in order to suppress exposure of their conduct.

This campaign involved unauthorized access to Plaintiff's computers, cloud drives, and devices, deletion of proprietary tools, and laundering of stolen data through partisan media and other online channels. Defendant(s)' conduct constitutes violations of 17 U.S.C. § 501 et seq. (copyright infringement), 18 U.S.C. § 1030 (computer fraud and abuse), § 1832 (theft of trade secrets), § 1343 (wire fraud), and § 1503 (obstruction of justice)—each a predicate act under 18 U.S.C. §§ 1961–1962.

By plagiarizing Plaintiff's work while simultaneously defaming him, Defendant(s) converted proprietary research into propaganda to protect the enterprise, mislead the public, and sabotage oversight. Plaintiff seeks declaratory relief confirming his ownership of the stolen materials, compensatory and treble damages under 18 U.S.C. § 1964(c), and injunctive relief to prevent further misappropriation and misuse.

## COUNT V – Slander, Defamation, and Coordinated Reputational Sabotage (Web3 Sector & Name/Likeness Misuse)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Above the Law Land (The Cryptodickbutt Regime Deposition), its accompanying exhibits (ATL-1 through ATL-6) and CC-D3

Defendant(s), fully aware of Plaintiff's cooperation with regulators and law enforcement, initiated a coordinated digital campaign to defame and discredit him throughout the Web3 sector. This included false statements, proxy harassment, and misuse of his name and likeness in parody tokens and "drops" timed with the so-called "9/11 mint," intended to humiliate and neutralize him at moments of major exposure.

As a core component of the above-referenced defamation and reputational sabotage, Exhibit CC-D3 documents the repeated and deliberate acts of misappropriation of likeness carried out by individuals

and entities within the blockchain ecosystem. These actors—part of the same enterprise identified in Exhibit CC-D2—have repeatedly launched and promoted coins, tokens, and assets invoking the image, concept, and symbolism of the UNIKORN, a name and identity directly associated with the Plaintiff.

These coins were not minted in good faith. Instead, they were deployed in a manner designed to defile and mock, diluting the significance of the UNIKORN while simultaneously exploiting its market draw to generate hype and financial gain. This tactic demonstrates a broader cultural warfare strategy: to mock the affiant while monetizing his likeness and suppressing public recognition of his legitimate regulatory and humanitarian work.

The Bored Ape Yacht Club (BAYC) serves as a central example. This project, heavily tied to the political elite and individuals affiliated with the Epstein list, launched its own coin drop as part of this scheme. Within its marketing narrative, BAYC introduced a mocking character named Cornelius Husk, a turkey-themed persona transparently designed to ridicule the affiant, Kornelius Kong, and to degrade his identity through parody. This pattern reflects not only cultural mockery but also organized misappropriation of name and likeness for profit and enterprise gain.

The strategic intent behind these acts is clear: to weaponize parody, defilement, and mockery as a market capture strategy while suppressing public knowledge of the affiant's true influence and popularity. What these individuals and entities do not want the general public to know is the extent of the hype and recognition surrounding the affiant, particularly in Russia, Southeast Asia and Middle East.

The affiant's reputation and following among K-POP and J-POP stars—artists who have openly supported and assisted in intelligence gathering against trafficking operations—further demonstrate the credibility and global resonance of the affiant's mission. Beyond this, the affiant has also received accurate intelligence support from Russian and North Korean sources, further validating the international recognition of his efforts and the seriousness of the trafficking operations he has opposed.

These regions, historically plagued by trafficking networks, have provided fertile ground for alliances that undermine the operations of the very enterprise documented in this Civil RICO action. The use of mockery coins, therefore, is not trivial or satirical; it is a deliberate tactic to diminish, discredit, and commercially exploit the affiant's identity while concealing the reality of global recognition and operational success.

Accordingly, these acts are entered into the record as predicate offenses of identity theft, fraud, racketeering, and misappropriation of likeness under federal law, and as further evidence of the enterprise's systemic and coordinated pattern of behavior within the Web3 sector.

These acts were carried out knowingly, maliciously, and in furtherance of the racketeering enterprise. The campaign was designed to suppress Plaintiff's speech, mislead the public, and obstruct Plaintiff's ongoing investigations into capital flight, trafficking, and cybercrime. This conduct constitutes defamation per se, tortious interference with business and governmental relations, and retaliation for protected activity, forming predicate acts of wire fraud (§ 1343), obstruction (§ 1503), and intimidation (§ 1512) under 18 U.S.C. § 1961(1). Plaintiff seeks compensatory, punitive, and treble damages under

18 U.S.C. § 1964(c), as well as injunctive relief to compel removal of defamatory content, restoration of Plaintiff's reputation, and disclosure of those who financed or coordinated the smear campaigns.

## Count VI – Retaliation, Witness Tampering & Obstruction of Justice (Financial Sabotage and Technological Manipulation)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section Gazprom, Chase, WhatsApp & More, together with Exhibit August 17–18, 2024 Incident Report.

After Plaintiff publicly exposed capital-flight and trafficking-linked digital-asset schemes, Defendant(s) retaliated through coordinated acts of financial obstruction, digital sabotage, and psychological manipulation. These acts included:
– interception and diversion of aid-linked financial transfers (Gazprom),
– fraudulent reversals of legitimate Zelle transactions through JPMorgan Chase,
– hijacking of encrypted WhatsApp communications, and
– deployment of directed-energy and surveillance technologies designed to provoke, intimidate, or silence Plaintiff.

The August 17–18, 2024 incident demonstrates a deliberate effort to criminalize and neutralize Plaintiff's investigative work through technological interference and provocation. This pattern of conduct constitutes violations of 18 U.S.C. §§ 1512 (witness tampering), 1513 (retaliation against a witness), 1343 (wire fraud), 1030 (computer fraud and abuse), and 1962(c)–(d) (RICO).

By retaliating against Plaintiff for lawful whistleblowing and evidence disclosure, Defendant(s) engaged in obstruction of justice and witness intimidation forming part of the enterprise's continuing racketeering scheme. Plaintiff seeks declaratory relief, treble damages under 18 U.S.C. § 1964(c), and injunctive orders compelling financial restitution and cessation of retaliatory digital and technological attacks.

## Count VII – Sabotage of FIT21 Regulatory Process & Obstruction of Congressional Oversight (Delaware Enterprise Nexus and Capital Flight Scheme)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and all related evidentiary sections, including *Section VC–Crypto Series, Section Exchanges, Section Bluechips, Section Delaware Corp Nest, Section FIT21*, and the *Capital Flight Affidavit and Probable Cause – FIT21/Delaware.*

While advising on digital-asset reforms, Plaintiff advocated for the Financial Innovation and Technology for the 21st Century Act (FIT21), including a retroactive clause crafted to expose and remedy prior fraud in the digital-asset markets. Upon realizing that enactment of the clause would unwind illicit profits and impose accountability, Defendant(s)—including lobbyists, foreign agents, and compromised public officials—launched a coordinated campaign of data manipulation, misinformation, and interference with Plaintiff's communications to lawmakers.

As documented in *Section FIT21* and the *Capital Flight Affidavit – FIT21/Delaware*, the sabotage of FIT21 was orchestrated through an association-in-fact enterprise composed of Delaware-incorporated entities, venture-capital funds, and foreign financial intermediaries, designed to preserve global capital flight, tax evasion, and digital-asset laundering infrastructure. This network used Delaware's corporate anonymity laws to disguise ownership, funnel lobbying funds, and obstruct beneficial-ownership disclosures—creating a jurisdictional blind spot that enabled unregulated digital-asset transactions and foreign influence operations.

As further detailed in *Section Delaware Corp Nest*, Delaware served as the domestic corporate command node of the enterprise, facilitating the concealment of shell-company ownership, layered venture structures, and capital exfiltration schemes. Foreign actors—including Israeli, Emirati, and Ukrainian financial entities—leveraged these corporate vehicles to disguise participation in FIT21 opposition campaigns, influencing U.S. legislators through coordinated misinformation and campaign financing.

FIT21 Economic Impact Clause

According to the *Capital Flight Affidavit and Probable Cause – FIT21/Delaware*, FIT21 would have repatriated U.S. capital, curbed inflationary pressure, and restored transparency to digital-asset markets by mandating registration of offshore exchanges and token issuers. Defendant(s)' sabotage of FIT21 directly enabled the continuation of engineered capital flight, permitting the siphoning of domestic wealth into offshore accounts and unregulated digital instruments. This obstruction perpetuated inflationary instability, currency devaluation, and market distortion, constituting a deliberate act of economic warfare against the United States. The same actors benefited through speculative trading and venture-capital enrichment while concealing their activity under Delaware's opaque structures.

These acts obstructed congressional deliberation and regulatory reform, preserving global capital-flight and fraud mechanisms that destabilized the economy and undermined public trust. The conduct constitutes violations of 18 U.S.C. §§ 1505 (obstruction of Congress), 1512 (witness tampering), and 371 (conspiracy to defraud the United States), and forms predicate acts within the meaning of 18 U.S.C. § 1961(1).

By reason of Defendant(s)' conduct, Plaintiff suffered economic injury, reputational damage, and deprivation of his right to petition government officials. Plaintiff seeks declaratory and injunctive relief prohibiting further obstruction, together with treble damages and costs pursuant to 18 U.S.C. § 1964(c).

## Count VIII – Unlawful Directed-Energy and Surveillance Operations (Torture, Retaliation & Invasion of Privacy)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section DEW – Directed Energy Weapons; Section DEW (Annex) – Defense Contractor Patents & Technical Evidence; Section DEW (Video); and Section Pegasus / NSO / Other Spyware – Digital Surveillance Systems and Covert Intelligence Tools, together with all referenced Exhibits and supporting documentation.

Defendant(s) and their affiliated contractors engaged in covert harassment, psychological warfare, and retaliatory surveillance operations utilizing Directed-Energy Weapons (DEWs), Voice-to-Skull (V2K) auditory transmission technologies, and digital espionage systems, including Pegasus-class spyware and persistent smart-device monitoring platforms such as Meta Ray-Ban Glasses. Through unauthorized access to Plaintiff's computers, mobile devices, and encrypted communications, Defendant(s) observed his activities in real time, intercepted private messages, and exfiltrated sensitive investigative data related to his whistleblower disclosures. These acts were executed as retaliation for Plaintiff's exposure of transnational racketeering, capital flight, and intelligence-linked corruption networks.

This conduct constitutes unlawful surveillance, retaliation, and torture under U.S. and international law, violating 18 U.S.C. §§ 241, 242, 1030, 1512, and 1962(c)–(d), and further violates the Geneva Conventions and Convention Against Torture, which prohibit psychological and biomedical experimentation on civilians.

As detailed in Section DEW and Section DEW (Annex), U.S. defense contractors and government agencies have long patented and developed electromagnetic and neurological manipulation technologies. Notable examples include U.S. Patent 6470214 B1 (U.S. Air Force) describing remote auditory induction into the human mind ("Voice-to-Skull"), and U.S. Patent 7629918 B2 (Raytheon Company) outlining a multifunctional radar-based directed-energy system capable of disrupting both electronics and biological targets. These and related patents—compiled in the Annex—prove that directed-energy systems capable of remote neural interference have existed and been operationalized for decades.

In parallel, Section Pegasus / NSO / Other Spyware provides evidence of advanced digital surveillance tools capable of real-time device compromise and behavioral monitoring. Pegasus, developed by the NSO Group, enables zero-click infiltration of smartphones, activation of microphones and cameras, and extraction of encrypted data. Similar Pegasus-class systems have been utilized in coordination with intelligence networks to track, silence, and psychologically target journalists, activists, and whistleblowers. The Plaintiff's own digital forensics reflect clear indicators of Pegasus-type surveillance activity, consistent with the methods outlined in these exhibits.

Together, the evidence set forth in Sections DEW, DEW (Annex), DEW (Video) and Pegasus / NSO / Other Spyware establishes that Defendant(s) orchestrated a coordinated campaign of electromagnetic targeting and digital surveillance against the Plaintiff in violation of federal law and international prohibitions on torture.

By reason of this conduct, Plaintiff sustained significant psychological and economic injury. He seeks compensatory, punitive, and treble damages under 18 U.S.C. § 1964(c) and injunctive relief prohibiting the continued use of directed-energy and surveillance technologies against him or any other protected witness.

## Count IX – Engineered Capital Flight, Securities Fraud, and Inflationary Sabotage (Economic Warfare, Market Manipulation, Insider Enrichment & Racketeering Activity)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section VC–Crypto Series: Securities Fraud, Unregulated Digital Assets, Insider Enrichment, and Capital Flight; Section Exchanges; Section Bitcoin Whales – Market Manipulation, Insider Trading, and Illicit Enterprise Activity; and Section Bluechips – Elite Ruggers, together with all referenced Exhibits and supporting documentation.

Defendant(s) deliberately orchestrated a transnational system of capital flight, securities fraud, and insider enrichment through unregulated digital-asset platforms, venture-capital conduits, and exchange-based market manipulation, forming a continuing pattern of racketeering activity in violation of *18 U.S.C. §§ 1341–1343 (mail and wire fraud), §§ 1956–1957 (money laundering), and §§ 1961–1962 (RICO enterprise and conspiracy)*.

As set forth in the incorporated Sections, Defendant(s)' enterprise structure consisted of interconnected venture-capital firms, digital-asset exchanges, "blue-chip" hedge funds, and Israeli- and Ukrainian-linked technology intermediaries who jointly engineered a massive system of economic extraction and inflationary sabotage. Through coordinated pre-mined token issuance, insider trading, and liquidity manipulation, Defendant(s) siphoned trillions in value from global markets while concealing illicit proceeds through offshore entities, custodial wallets, and unregulated exchanges.

The VC–Crypto Series establishes that this architecture was deliberately designed to evade securities laws, funnel investor funds into private enrichment schemes, and weaponize unregistered digital assets as covert financial instruments for capital flight. The Exchanges section documents how these platforms facilitated systemic wash trading, false volume reporting, and cross-exchange arbitrage designed to mislead regulators and inflate asset values artificially. The Bitcoin Whales section traces insider wallets and custodial movements that reveal coordinated manipulation of price cycles, serving as the operational backbone of the enterprise's financial war model. The Bluechips – Elite Ruggers documentation further identifies top-tier corporate and institutional actors—Silicon Valley VCs, Israeli-linked funds, and NATO-aligned economic networks—who knowingly participated in or benefited from this global scheme of engineered liquidity collapses and economic warfare.

This coordinated network of actors used unregulated digital-asset markets not as instruments of innovation, but as vehicles for systemic wealth transfer, money laundering, and market destabilization. The enterprise's actions produced inflationary pressure by draining national liquidity, manipulating commodity correlations, and redirecting sovereign capital into offshore tax shelters. In effect, Defendant(s) weaponized the global economy through deliberate acts of financial racketeering, transforming the digital-asset ecosystem into an international laundering machine.

As detailed across these Sections, Defendant(s)' conduct was not isolated profiteering—it was a structured economic operation intentionally synchronized with legislative obstruction, lobbying interference, and information suppression to prevent oversight and accountability. The suppression of the FIT21 digital-asset reform bill and related whistleblower disclosures demonstrates the enterprise's intent to maintain control over illicit liquidity channels while silencing those exposing their schemes.

Through these actions, Defendant(s) and their affiliates enriched themselves while inflicting direct economic harm upon the United States, its citizens, and Plaintiff personally, whose investigative work exposed the mechanisms of engineered capital flight and who suffered retaliation and reputational sabotage as a result.

The acts alleged herein constitute predicate offenses under *18 U.S.C. §§ 1341, 1343, 1956, 1957,* and *1961(1)* and form part of an ongoing enterprise violating *18 U.S.C. § 1962(c)–(d)*. Defendant(s)' conduct also constitutes securities fraud under *15 U.S.C. §§ 77q, 78j(b), and 17 C.F.R. § 240.10b-5,* given their material misrepresentations, fraudulent omissions, and insider trading practices across the digital-asset markets.

Plaintiff seeks declaratory and injunctive relief recognizing Defendant(s)' participation in a global racketeering and financial-manipulation enterprise; treble damages pursuant to *18 U.S.C. § 1964(c)*; disgorgement of illicit profits; repatriation of offshored assets; and full restitution for economic, reputational, and constitutional injuries resulting from the enterprise's ultra vires conduct.

## Count X – 9/11: Transnational Criminal Enterprise and Genesis of the War on Terror (Economic and Institutional Racketeering)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including *Section 911 – September 11 as a Transnational Criminal Enterprise, Section CF – Engineered Capital Flight, Section IMF – International Monetary Fund: The Global Enforcer of Debt Slavery, Section LOND – The City of London as the Master Node of Global Racketeering, Section NATIONAL CENTRAL BANKS – Domestic Enforcers of the Cartel System, Section WORLD BANK – Infrastructure as a Tool of Cartel Domination, Section Deutsche Bank – The Cartel's Dirty Workhorse,* and *Section BIS – Bank for International Settlements: The Apex of the Cartel,* together with their supporting exhibits.

Defendant(s) and their affiliates planned, facilitated, and profited from the September 11, 2001 attacks as part of a transnational racketeering enterprise that weaponized crisis events to justify perpetual war, global surveillance, and the dismantling of constitutional oversight. The enterprise constructed a permanent security-industrial complex diverting trillions in public funds to private contractors and foreign intermediaries, while concealing fraud, insider trading, and institutional corruption.

This scheme also served as the foundation for engineered capital flight, as Defendant(s) used unregulated markets, offshore conduits, and defense-financing mechanisms to extract global wealth, establishing a supranational financial system immune from regulation and accountability.

Evidence of premeditation is established by the actions of the *Bank for International Settlements (BIS)*, which convened an emergency meeting of central bank governors in Basel on September 12, 2001— less than twenty-four hours after the attacks. Liquidity coordination measures that would normally require weeks of planning were executed overnight, demonstrating prior arrangement and foreknowledge of financial disruption. The BIS, acting under its immunity framework established by the *1930 Hague Convention* and the *1987 Swiss Federal Decree,* coordinated with the *Federal Reserve, European Central Bank,* and other member institutions to inject liquidity and stabilize markets before

investigations could trace insider trading patterns tied to pre-9/11 airline and insurance short positions. This post-attack convening shows that contingency systems and profit channels were already structured in advance, confirming the enterprise's orchestration and concealment mechanisms at the highest levels of global finance.

The described conduct constitutes predicate acts of *fraud upon the United States (§ 371), obstruction of justice (§ 1503), conspiracy against rights (§ 241), deprivation of rights under color of law (§ 242), money laundering (§§ 1956–1957),* and *racketeering (§ 1962).*

The *Plaintiff's findings* further demonstrate that the enterprise's architecture predates the attacks, with financial patterns, legislative frameworks, and defense procurement channels established years in advance. This includes deregulation policies, off-balance-sheet accounting mechanisms, and offshore financial conduits coordinated through the *Bank for International Settlements (BIS),* the *Federal Reserve,* and the *European Central Bank.*

The *BIS,* operating under the *1930 Hague Convention* and *1987 Swiss Federal Decree,* activated emergency liquidity operations channeled through transnational institutions such as *Deutsche Bank, Credit Suisse,* and other intermediaries directly tied to the Defendant(s). These mechanisms prevented exposure of insider trading activity by routing settlements through offshore derivatives markets, thus concealing the enterprise's profit channels.

The coordination between financial and intelligence actors following September 11 reflects a dual-use system that both managed public perception and monetized crisis. Market stabilization, presented as a defensive measure, in fact represented the controlled unwinding of pre-attack positions structured for insider gain.

Through this operation, Defendant(s) and affiliates institutionalized *engineered capital flight* as a perpetual mechanism of wealth extraction. By embedding these systems within sovereign monetary frameworks, the enterprise created a *supranational financial architecture* immune from domestic oversight and democratic accountability.

The resulting *War on Terror* provided legal and rhetorical cover for this architecture. By manufacturing a state of permanent emergency, Defendant(s) legitimized extrajudicial surveillance, covert financing, and unrestrained contracting authority. This permitted the continuous laundering of illicit profits under the guise of national defense and security expenditures.

The institutional partners to this enterprise—central banks, defense conglomerates, intelligence agencies, and their private intermediaries—formed a cohesive cartel. The *BIS* served as the apex node, while the *Federal Reserve, IMF, World Bank,* and *City of London* functioned as operational enforcers. Each node of this cartel system played a defined role in enabling *institutional racketeering, money laundering,* and *fraud upon the United States.*

The *Plaintiff's exhibits* within *Section 911* document direct interlocks between financial institutions and government contractors who profited from both pre- and post-attack operations. The continuity of these profit channels—through no-bid contracts, war bonds, reconstruction financing, and black-budget appropriations—illustrates the evolution of a permanent war economy.

This Count therefore asserts that the *September 11 attacks* were the genesis event for an ongoing racketeering enterprise that weaponized geopolitical instability for profit. The "War on Terror" was not an act of defense but a corporate and financial strategy, executed through institutions possessing both state power and private immunity.

Each of these acts constitutes predicate violations under:
*18 U.S.C. § 371* – Conspiracy to Defraud the United States
*18 U.S.C. § 1503* – Obstruction of Justice
*18 U.S.C. § 241* – Conspiracy Against Rights
*18 U.S.C. § 242* – Deprivation of Rights Under Color of Law
*18 U.S.C. §§ 1956–1957* – Money Laundering and Transactional Structuring
*18 U.S.C. § 1962* – Racketeer Influenced and Corrupt Organizations Act (RICO)

The Plaintiff therefore seeks:

Declaratory findings recognizing the *September 11, 2001 attacks* as the genesis of a transnational economic and institutional racketeering model; full accounting and disclosure of all financial instruments, derivatives, and emergency liquidity mechanisms executed between *September 10–14, 2001* under the direction of the *BIS, Federal Reserve*, and related entities; injunctive relief preventing further use of state emergencies as vehicles for private profit extraction; and treble damages under *18 U.S.C. § 1964(c)*.

Through this Count, Plaintiff establishes that the *9/11 operation* was the foundation upon which the global cartel system consolidated control—merging economic, political, and intelligence infrastructure into a single criminal enterprise. The attacks were both the cover story and financial ignition point for the twenty-first century's most sophisticated mechanism of wealth transfer and institutional corruption.

## COUNT XI – FIRST AMENDMENT RETALIATION AND SUPPRESSION OF PROTECTED SPEECH (Civil Rights Deprivation & Racketeering)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including Section AL – American Lockout, Exhibit Suppression X, Exhibit Suspension X, and related exhibits. Plaintiff further incorporates by reference Section UAE / X – Systematic Suppression of First Amendment Rights by UAE-Controlled Twitter, including Exhibits UAE/X-1 through UAE/X-3 and UAE/X-5, which document coordinated censorship, reputational defamation, algorithmic throttling, and foreign interference targeting Plaintiff's constitutionally protected speech and whistleblower activity. Plaintiff also incorporates Section Israel – False Statements and its exhibits in full, which establish that the label "anti-Semitism" has been fraudulently deployed by the Enterprise to suppress lawful investigative and political speech, constituting retaliatory and racketeering conduct under U.S. and international law.

Defendant(s), acting individually and in concert through state, corporate, and intelligence channels, engaged in a deliberate campaign to suppress Plaintiff's constitutionally protected expression, investigative disclosures, and lawful petitions to government. Through the coordinated use of social-

media algorithms, proxy moderation systems, and reputational-attack networks, Defendant(s) obstructed Plaintiff's ability to communicate, silenced his reports of government corruption and financial crime, and destroyed his digital reach. As established in Exhibit UAE/X-1, the platform Twitter (now X) operated under covert influence from UAE-linked actors who weaponized algorithms to filter visibility, suppress engagement, and deny Plaintiff the ability to defend himself publicly. Posts exposing racketeering, trafficking, and state-corporate misconduct were hidden from followers, metrics were artificially reduced, and community access to Plaintiff's content was algorithmically blocked. Law enforcement and the public were directed not to engage with his material, illustrating a pattern of coercion and isolation designed to chill whistleblowing and obstruct lawful communication.

The retaliatory conduct intensified when Plaintiff exposed Israeli state-linked involvement in transnational racketeering, including the 9/11 criminal enterprise. In response, Defendant(s) and their collaborators began labeling Plaintiff "anti-Semitic," not as a statement of fact, but as a deliberate falsehood to suppress protected speech and destroy his reputation. As demonstrated in Section Israel – False Statements, this accusation rests on fraudulent premises, as genetic, historical, and scholarly evidence prove that modern Jewish populations are of mosaic ancestry—Caucasus, European, and Semitic—not exclusively Semitic. Despite this, the Enterprise knowingly weaponized the term "anti-Semitism" to criminalize dissent, conceal state crimes, and obstruct Plaintiff's protected whistleblower communications.

The Johns Hopkins University study by Dr. Eran Elhaik, *The Missing Link of Jewish European Ancestry: Contrasting the Rhineland and the Khazarian Hypotheses* (*Genome Biology and Evolution*, 2012), established that European Jewish populations cluster genetically with Caucasus and Southern European groups, not with Middle Eastern or Semitic populations. The study concluded that the Khazarian Hypothesis best explains the mosaic ancestry of European Jews and rejects the Rhineland Hypothesis as insufficient to account for genetic diversity. This peer-reviewed scientific record confirms that the term "anti-Semitism," as used by the Enterprise to target political critics, constitutes a knowingly false statement. The accusation presumes exclusive Semitic descent, which is biologically and historically inaccurate, and its deployment to silence Plaintiff represents fraudulent misrepresentation under 18 U.S.C. §§ 1001, 1341, 1343, and 1962(d).

Historical records further reinforce this finding. Benjamin H. Freedman's *Jesus Was Not a Jew* (Common Sense, 1953, 1959 reprints) documented that the term "Jew" was a mistranslation and political appropriation dating to the eighteenth century, designed to conflate Khazar converts with Biblical Israelites. Freedman and classical sources including *Josephus, Antiquities of the Jews* (XIII.ix.1, XV.vii.9) and the *Jewish Encyclopedia* (1903) confirm that Edomite and Khazar populations were integrated into later Jewish identity through forced conversions and political assimilation. This proves that modern claims of exclusive Semitic descent are knowingly false and that accusations of "anti-Semitism" are deployed as tools of fraud, censorship, and coercion by the Enterprise to silence critics and secure unlawful advantage.

The Enterprise's coordinated censorship operations extended through lobbying arms such as AIPAC, digital platforms such as Twitter/X, and political figures acting in concert to suppress lawful speech. Israeli ministries and foreign lobbies exported the IHRA definition of "anti-Semitism" to U.S. institutions and social media platforms, using it as a shield to deflect accountability for corruption,

trafficking, and war crimes. Twitter/X, acting as an instrumentality of foreign influence, implemented algorithmic suppression, shadow-banning, and reputation manipulation to destroy Plaintiff's digital presence and isolate him from the public sphere. These acts constitute retaliation against a protected whistleblower and violations of 18 U.S.C. §§ 241, 242, 1512, 1503, and 1962, as well as direct deprivation of First Amendment rights.

By misusing "anti-Semitism" to retaliate against protected speech, the Enterprise engaged in mail and wire fraud through coordinated digital communications, false statements under 18 U.S.C. § 1001, obstruction of justice, and conspiracy to violate civil rights. This conduct satisfies the elements of racketeering under 18 U.S.C. §§ 1961–1968, demonstrating a continuing pattern of unlawful activity designed to suppress political dissent and conceal the Enterprise's criminal and financial operations. Through digital propaganda, defamation, and algorithmic interference, the Enterprise transformed a public communication forum into a retaliatory surveillance grid. Plaintiff's identity, research, and protected disclosures were de-ranked, and plagiarized while defamers and impostors were rewarded, constituting systemic retaliation under color of law and obstruction of justice under §§ 1503 and 1512.

As a direct and proximate result of Defendant(s)' acts, Plaintiff suffered irreparable harm including suppression of speech, reputational destruction, loss of professional opportunities, and obstruction of lawful communications with federal authorities. Plaintiff's speech was chilled through psychological defamation, coordinated harassment, and unlawful denial of access to public platforms. These acts were executed in retaliation for Plaintiff's protected whistleblower activity exposing war crimes, financial corruption, and global racketeering systems.

Plaintiff seeks declaratory and injunctive relief prohibiting further censorship, algorithmic suppression, and retaliatory interference by Twitter/X and affiliated entities; immediate restoration of speech and access rights across U.S.-based digital communications infrastructure; and compensatory, punitive, and treble damages under 18 U.S.C. § 1964(c) for economic, reputational, and constitutional injury. The courts are urged to recognize that political labeling as "anti-Semitic," when used to silence lawful investigation or protected criticism, constitutes a false statement, a racketeering act, and a form of First Amendment retaliation that cannot stand under the Constitution or the laws of the United States.

## Count XII – Usurpation and Interference with Dynastic and Political Rights (Fraudulent Inducement, Fabrication, Civil Conspiracy & Conversion)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including *Section Clomanov Conspiracy, Section Root Cause of the Ukrainian Conflict – With RICO Context,* and all related exhibits.

Defendant(s) engaged in a high-level scheme of inducement, fabrication, and manipulation, promising Plaintiff political recognition and a Saint Petersburg leadership position in exchange for actions benefitting their transnational interests—including facilitating political outcomes favorable to Donald J. Trump and his foreign and financial backers. After securing such benefits, Defendant(s) reneged, coordinated reputational attacks, and sought to neutralize Plaintiff's dynastic influence through defamation, coercion, and interference.

As detailed in the referenced Ukrainian Conflict section, this operation coincided with the enterprise's broader objective of exploiting post-Soviet instability for economic extraction and geopolitical gain. Based on the pattern of coordinated interference, the timing of events, and the conduct of Defendant(s), Plaintiff reasonably believes that his emergence as a legitimate heir committed to protecting the Russian population—and his outspoken opposition to corruption, trafficking, and engineered capital flight—was perceived as an obstacle to the enterprise's destabilization strategy.

Upon Plaintiff's entry into the political and investigative arena, Defendant(s) and their affiliates appear to have orchestrated the creation and promotion of fabricated "Clomanov" identities—false heirs and impostors designed to dilute Plaintiff's legitimacy, fragment hereditary continuity, and facilitate Western-aligned influence within Russian political and cultural institutions.

This "Clomanov puppet" construct, as alleged on information and belief, served two principal purposes: first, to undermine and neutralize Plaintiff's moral and hereditary opposition to the enterprise's trafficking and financial-crime apparatus; and second, to provide justification for Western and allied financial actors to expand influence and economic control within Russia under the pretense of responding to "internal chaos." Through this deception, Defendant(s) furthered their control over regional capital flows, directing funds through offshore havens and digital-asset networks tied to NATO, Israeli, and Ukrainian intermediaries.

The coordinated participation of NATO-aligned operatives, Israeli-linked intelligence contractors, Ukrainian financial intermediaries, and U.S.-based lobby networks demonstrates a deliberate effort to exploit dynastic and geopolitical structures for profit and control. This collective conduct forms part of the larger racketeering enterprise alleged throughout this Complaint and represents a continuation of the same mechanisms of capital flight, information warfare, and human-rights violations previously detailed.

This maneuver also functioned as a geopolitical provocation designed to entangle the United States militarily and financially in a manufactured conflict. During a 2023 press conference, Ukrainian President Volodymyr Zelenskyy explicitly stated that "*the U.S. will have to send their sons and daughters exactly the same way as we are sending ours to war*," a remark widely reported and interpreted as acknowledging Western intent to expand the conflict's burden onto American forces. This statement, in context, illustrates the enterprise's expectation that U.S. involvement would serve as both cover and catalyst for further capital-flight operations and defense-contract profiteering, aligning precisely with the racketeering pattern described herein.

Such acts constitute fraudulent inducement, civil conspiracy, conversion, and racketeering activity under 18 U.S.C. §§ 1343 (wire fraud) and § 1962 (racketeering), as well as violations of §§ 241–242 (civil-rights deprivation and conspiracy against rights). These actions further implicate international legal norms protecting political participation, hereditary dignity, and self-determination.

Plaintiff seeks declaratory findings recognizing the fabrication of false heirs and coordinated usurpation efforts as predicate acts of racketeering; injunctive relief restoring his legitimate political and hereditary status; compensatory and treble damages under 18 U.S.C. § 1964(c); and formal acknowledgment of the deprivation of his dynastic and political rights resulting from Defendant(s)' ultra vires and conspiratorial conduct.

## Count XIII – Psychological Warfare and Cultural Manipulation of Civilian Populations *(Q Narrative, Controlled Disclosure & Cultural-Fragmentation Operations)*

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and Section FU – Cultural Warfare & Identity Fragmentation, including Exhibits FU-1 through FU-4, Exhibit 4CHAN, Exhibit X – *TikTok: Weaponization of the 99%*, Section VC-Crypto Series Security Fraud, Unregulated Digital Assets, Insider Enrichment, Capital Flight and all related appendices. Plaintiff further incorporates by reference Section ELIZAOS – *Manipulation and Polarization of the American Public* and Section UNIT-8200, including Exhibits ELIZAOS-1 through ELIZAOS-6, which together demonstrate the operational structure of the enterprise's algorithmic-psychological apparatus and its deployment across social, political, and financial domains.

Defendant(s), acting individually and through an association-in-fact enterprise composed of U.S., Israeli, NATO, and transnational intelligence-linked entities, orchestrated a coordinated program of psychological warfare and cultural manipulation directed at global civilian populations. Using ELIZAOS, Unit 8200–affiliated contractors, and AI-driven media systems integrated through ai16z, X Crackers, and other behavioral-engineering platforms, the enterprise executed a campaign of perception management, social polarization, and cognitive entrainment intended to pacify the public, conceal capital flight, and shield enterprise figures from accountability.

As established in Section ELIZAOS, the enterprise developed a sophisticated AI manipulation platform designed to interface directly with human digital identities through Soul Bound Tokens. This system, ELIZAOS, originated under the ai16z framework with substantial Israeli investment and advisory influence. It was built with dual civilian–intelligence utility, allowing the enterprise to manipulate cognition, sentiment, and discourse through algorithmic amplification, shadow suppression, and influencer network orchestration. Integrated with compromised X accounts via X Crackers bot farms, ELIZAOS provided the enterprise with mass-scale behavioral control, converting public platforms into weaponized psychological grids.

Through this architecture, the enterprise engineered and weaponized mass-disinformation schemes such as the Q Narrative, Mr. Pool, and related "false-hope" operations. These systems combined predictive AI, algorithmic reinforcement, and behavioral psychology to transform digital ecosystems into engines of obedience. Movements once aligned with anti-corruption ideals were hijacked and repurposed to protect the racketeering structure itself. As documented in Exhibits 911-ELIZAOS-2 and 911-ELIZAOS-3, the Q operation was directly integrated into ELIZAOS, its releases timed to deflect exposure of Israeli intelligence, defense-contractor, and capital-flight networks.

The Q operation, coordinated through Donald J. Trump's campaign apparatus, Jared Kushner, Lt. Gen. Michael Flynn, and Israeli Unit 8200 contractors, represented a large-scale psychological operation masquerading as patriotic awakening. The "Q-drops" and decode subcultures functioned as controlled-disclosure loops, teaching followers that submission equaled participation and belief substituted for evidence. This structure weaponized faith, patriotism, and civic trust, conditioning populations into algorithmic dependency and passivity while obscuring war profiteering and transnational racketeering.

The same infrastructure extended through Elon Musk's acquisition of X (formerly Twitter), Larry Ellison's Oracle-linked data contracts, and Andreessen Horowitz's AI portfolio, unifying digital influence, algorithmic surveillance, and social engineering under a common enterprise. As shown in the ELIZAOS exhibits, X Crackers facilitated bot-farm control of real user accounts, algorithmically simulating consensus and drowning dissent through manufactured virality. The enterprise deployed these assets to suppress voices exposing child trafficking, capital flight, and intelligence corruption while amplifying narratives that protected enterprise interests.

Section UNIT-8200 confirms that Israeli SIGINT operatives and AI contractors were central to the development, deployment, and maintenance of this system. The behavioral algorithms, predictive engagement models, and mass-polarization mechanisms mirrored Unit 8200's documented methodology in global influence operations. The integration of these intelligence techniques into Western social media infrastructures blurred the boundary between state surveillance and corporate control, resulting in algorithmic colonization of public consciousness.

Plaintiff himself was directly targeted through ELIZAOS. Using integration with his Soul Bound Token (X Raw Token), the enterprise manipulated his digital environment, altered information flows to his X accounts, and mirrored his communications through synchronized responses from enterprise-linked political figures. This system of behavioral redirection constituted digital coercion and retaliatory psychological warfare against a whistleblower exposing their operations.

The transnational manipulation carried out through ELIZAOS and its derivative systems functioned as a unified racketeering mechanism merging market manipulation, digital censorship, and psychological control. Algorithmic recommendation loops were exploited to shape voter sentiment, destabilize civic discourse, and maintain artificial volatility in cryptocurrency markets, ensuring continued concealment of enterprise financial crimes.

This conduct constitutes predicate acts of wire fraud (18 U.S.C. §1343), mail fraud (§1341), computer fraud (§1030), obstruction of justice and witness tampering (§1512), material support for terrorism (§§2339A–B), and RICO conspiracy (§1962(d)), as well as violations of Articles 18–20 of the International Covenant on Civil and Political Rights (ICCPR) and the Geneva Conventions prohibiting psychological persecution of civilian populations.

As a direct and proximate result of these coordinated operations, Plaintiff and the public have suffered widespread informational injury, erosion of trust in institutions, civic demobilization, and reputational harm. Plaintiff was subjected to targeted censorship, defamation, and retaliatory surveillance due to his exposure of these psychological-warfare systems and the enterprise's integration of artificial intelligence into mass behavioral manipulation.

Accordingly, Plaintiff seeks declaratory and injunctive relief halting the enterprise's ongoing psychological-warfare and cultural-manipulation operations; a full accounting of all financing, contracts, and AI data-analytics programs linked to ELIZAOS, ai16z, Unit 8200, and affiliated entities; and treble damages under 18 U.S.C. §1964(c) for injury to business, property, and constitutional interests.

## Count XIV – Conflict Financing in Ukraine and Hamas Operations via Digital Assets and Political Deception

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, including Section WIH – Why Israel Created Hamas, Section False Statements Regarding Ukraine, and their related exhibits.

Defendant(s)—including elected officials such as Marco Rubio, foreign agents, intelligence-linked financiers, and digital-asset executives—knowingly participated in conflict financing through unregulated digital assets, substituting traditional aid conduits with tokenized relief schemes, NGO shells, and crypto exchanges functioning as covert channels for war and influence operations.

As documented in Section WIH, Israeli intelligence and allied defense-financial networks cultivated and funded Hamas as a managed opposition to justify perpetual conflict and budgetary expansion, while the same enterprise repurposed humanitarian aid in Ukraine through blockchain-based mechanisms sustaining proxy militias under NATO oversight.

Despite public denials, Defendant(s) facilitated or shielded these channels to preserve control over digital-asset flows and suppress reform initiatives such as FIT21. Their coordinated obstruction of Plaintiff's regulatory efforts ensured continued capital flight, inflationary harm, and geopolitical destabilization.

This conduct constitutes predicate acts of wire fraud (§ 1343), money laundering (§§ 1956–1957), false statements (§ 1001), obstruction (§§ 1503 and 1512), and RICO conspiracy (§ 1962(d)), as well as violations of the International Emergency Economic Powers Act and U.N. Security Council Resolution 1373 prohibiting terrorist financing.

Plaintiff seeks declaratory and injunctive relief recognizing Defendant(s)' complicity in digital-asset conflict financing, treble damages under 18 U.S.C. § 1964(c), and such further relief as this Court deems just and proper.

## Count XV – Gaza Genocide (Coordinated Extermination, AIPAC Collusion, DOGE Diversion, UNIK Scandal & Retaliation for Digital-Asset Exposure)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section HH – The Gaza War: Complicity, Profiteering, and Geopolitical Engineering, Section FA – War Crimes & Crimes Against Humanity (Israel), Section YY – Using Israel as a Beachhead to Destabilize the Middle East, Section AA – AIPAC Influence and Coercive Control of Western Governments, Section – Netanyahu / Zionist Subjugation, Section Trump Tower Gaza – Premeditated Ethnic Cleansing, and Exhibit DOGE, together with Exhibit ELON MUSK – Election Rigging, Exhibit Ethical Breach, Exhibit Israel Lobby Sabotage, Section WIH – Why Israel Created Hamas, Section GREATER ISRAEL, and Section KUSHNER – Gaza Policy and Foreign-Influence Concerns, including all attached exhibits, appendices, and supporting documentation.

Plaintiff further alleges that certain digital-asset financiers and related market participants, while not directly engaged in military operations, knowingly provided financial or technological infrastructure that enabled or concealed illicit flows of capital connected to the conflict. By prioritizing the protection

of their digital holdings and profit channels over transparency or compliance, these actors allegedly facilitated or willfully ignored transactions that materially supported the continuation of violence and corruption. Their conduct, if proven, constitutes participation in or knowing assistance to the broader enterprise's racketeering scheme under 18 U.S.C. § 1962(c) and forms part of the pattern of financial concealment and obstruction described throughout this Complaint.

As documented in Section HH, the Gaza War served as the operational convergence point for arms laundering, psychological warfare, and digital-asset enrichment, merging defense-contract profiteering with covert cryptocurrency flows. NATO-linked intermediaries and Ukrainian contractors facilitated weapons trafficking through Israeli channels, while Elbit Systems, Rafael, Raytheon, and Lockheed Martin rebranded surplus munitions from Eastern Europe to conceal illegal transfers. Simultaneously, AI-driven propaganda and influence operations sanitized mass killings in real time, shielding Defendant(s) from accountability.

As shown in Section WIH -- Why Israel Created Hamas, the Gaza War was not a sudden geopolitical eruption but the culmination of decades of deliberate policy in which Israeli intelligence and political leadership cultivated Hamas as a controllable proxy. Evidence compiled in WIH demonstrates that Israel financed and legitimized Hamas' early growth by licensing the Mujama al-Islamiya organization, approving the Islamic University of Gaza, and channeling funds through military governance budgets under officials like Avner Cohen and Yitzhak Segev. Exhibits WIH-1 through WIH-30 confirm that Hamas' creation was an instrument of divide-and-rule strategy, meant to fracture Palestinian political unity and provide permanent justification for military containment. The very group later used to justify genocide in Gaza was, by Israel's own admission and historical record, its own creation and tool. This context transforms the Gaza campaign from "self-defense" into premeditated extermination—an enterprise maintaining the illusion of an uncontrollable enemy to perpetuate occupation, war profiteering, and foreign-aid siphoning.

In Section FA, evidence demonstrates that civilians were deliberately targeted—hospitals, schools, refugee centers, and humanitarian corridors bombed in systematic violation of 18 U.S.C. § 1091 (Genocide), § 2441 (War Crimes), and Article 7 of the Rome Statute (Crimes Against Humanity). Gaza became a live laboratory for experimental weaponry, surveillance analytics, and psychological-control systems marketed globally to allied defense clients for profit.

**Section GREATER ISRAEL** provides the geopolitical blueprint for this coordinated extermination, revealing how the Gaza campaign functions as one arm of the broader "Greater Israel" strategy—a doctrine seeking territorial, political, and economic domination through perpetual destabilization of neighboring states. The section outlines how occupation policy, foreign lobbying, and militarized redevelopment converge under the Greater Israel model, positioning Gaza as both a testing ground and a propaganda crucible. This doctrine ties the genocide to transnational racketeering: the same networks funding displacement are the ones benefiting from reconstruction contracts, arms resupply, and global capital flows recycled through U.S. and Gulf intermediaries. The "Greater Israel" agenda thus connects the political intent behind the genocide to its financial machinery—an organized enterprise of extermination and expansion concealed beneath national-security rhetoric.

Section YY shows that Israel's long-standing doctrine treats Gaza as both containment zone and destabilization hub—ensuring perpetual militarization and unending Western aid. These actions were not random acts of war but an organized pattern of state-sponsored racketeering in violation of 18 U.S.C. §§ 1962(c)–(d) and §§ 2339A–B (Material Support for Terrorism).

Section AA further details how AIPAC and affiliated PACs functioned as political enforcement arms of the enterprise, coercing U.S. legislators through unlawful campaign contributions, intimidation, and propaganda to maintain weapons flows and suppress ceasefire advocacy. These acts violated 18 U.S.C. §§ 951, 1343, and 1961(1) by operating as unregistered foreign-agent conduits advancing a genocidal agenda.

Section – Netanyahu / Zionist Subjugation establishes that Benjamin Netanyahu, operating as head of the Zionist apparatus, directed coordinated intelligence, propaganda, and blackmail campaigns across the United States and allied nations to silence whistleblowers, influence media narratives, and maintain the financial lifelines enabling genocide.

The financial concealment system supporting the Gaza War is detailed in Exhibit DOGE, which exposes the so-called Department of Government Efficiency (DOGE) as a fraudulent façade concealing Pentagon budget diversions and digital-asset capital flight. Publicly branded as a "spending reform" initiative, DOGE secretly masked over $7 trillion (estimated) in digital-asset extraction and more than $21 trillion in unaccounted funds tied to defense, intelligence, and foreign-aid laundering. Discovery will show that DOGE was substituted for Plaintiff's UNIKORNAIO Capital Flight Recovery Framework, a legitimate financial-recovery model designed to trace, repatriate illicit wealth and protect vulnerable populations. Plaintiff was deliberately removed, defamed, and neutralized because his framework threatened exposure of the liquidity pipelines sustaining the enterprise's genocidal and geopolitical operations that has brought America to brink of a financial crisis.

**Section KUSHNER – Gaza Policy and Foreign-Influence Concerns** corroborates the modern financial dimension of this enterprise, detailing how Jared Kushner's Affinity Partners GP LLC— funded with billions from Saudi, Emirati, and Qatari sovereign wealth—channeled capital into Israeli defense, cybersecurity, and real-estate firms directly profiting from the Gaza war. Kushner's firm served as a post-government continuation of policy integration between Israel and the Gulf states originally established through the Abraham Accords. While Kushner publicly defended Israel's campaign in Gaza as "self-defense," his investments were yielding returns tied to those same operations. Senate Finance Committee records and FARA analyses show probable unregistered foreign-agent activity, merging state-level diplomacy and private capital. This foreign-financed structure mirrors the racketeering mechanics of DOGE—covert state-sanctioned diversion disguised as reform, laundering war profits through private equity and U.S. intermediaries. Together, these materials substantiate how American political elites became financial conduits in the genocide's supply chain, ensuring the protection of Israel's war economy while silencing the Plaintiff's exposure of its mechanisms.

As documented in Exhibit Intellectual Property Theft Disclaimer and Exhibit Israel Lobby Sabotage, the theft and misrepresentation of Plaintiff's investigative work formed what insiders later called the UNIK Scandal. Rather than genuinely embedding Plaintiff's frameworks or implementing his recovery

systems, Defendant(s) falsely claimed alignment with his research to manufacture credibility, influence voters, and consolidate political power—particularly within the GOP—so that their network could control oversight and insulate itself from investigation. Publicly posturing as reformers and promising to enact the very accountability mechanisms Plaintiff had proposed allowed them to gain office and protect the infrastructure sustaining the Greater Israel Project. Behind the façade of reform, the same individuals advanced the enterprise's laundering and war-financing agenda while discrediting the original investigator whose findings threatened exposure. This deception—feigning adoption of Plaintiff's ideas to neutralize their creator—was a calculated act of political and financial self-preservation, ensuring continued impunity and concealment of the digital-asset systems underlying genocide financing.

Section Trump Tower Gaza – Premeditated Ethnic Cleansing provides documentary evidence that genocide was coupled with pre-planned real-estate profiteering. The Trump Towers Gaza redevelopment project, drafted prior to the invasion, envisioned privatized luxury corridors and reconstruction schemes atop depopulated Palestinian land—demonstrating that extermination was not only political, but economic by design.

Defendant(s) escalated their retaliatory campaign once Plaintiff's UNIKORNAIO investigations and his public influence around digital-asset accountability and FIT21 reform began gaining traction. Plaintiff was not the author of FIT21, but his advocacy, expertise, and visibility within the reform movement made him an identifiable threat to the enterprise's concealed financial channels. The genocide was already being carried out under the Greater Israel Project; however, once Defendant(s) realized that Plaintiff's disclosures could connect the digital-asset economy to the ongoing atrocities, they intensified their efforts to discredit, silence, and eliminate his credibility. The goal was to protect its operational secrecy and prevent the world from learning how the digital-asset infrastructure enabled it.

**Had Plaintiff's warnings about unregulated digital-asset exploitation, capital flight, and laundering through decentralized finance been taken seriously by regulators, politicians, policymakers, or the media, the architecture facilitating these crimes could have been dismantled before the scale of atrocity reached irreversible magnitude.** Instead, Defendant(s) orchestrated an all-encompassing campaign of digital interference, surveillance and psychological warfare to neutralize him. These acts of concealment and retaliation allowed the genocide to proceed unimpeded, ensuring that the connection between financial manipulation, unregulated digital assets and war profiteering remained hidden from public scrutiny.

As corroborated in Exhibit ELON MUSK – Election Rigging, Defendant(s) leveraged communications infrastructure—including Starlink and X (formerly Twitter)—to suppress information, redirect narratives, and secure political advantage for those complicit in the UNIK Scandal. These same digital-asset pipelines underpinned both the DOGE laundering diversion apparatus and the defense-industrial profiteering network financing the Gaza operation.

This conduct constitutes a pattern of racketeering activity encompassing genocide, war crimes, obstruction of justice, money laundering, wire fraud, election interference, and witness retaliation, in violation of 18 U.S.C. §§ 1091, 2339A–B, 2441, 1343, 1503, 1513, and 1962(c)–(d). It further violates

the Geneva Conventions (IV), the Genocide Convention (1948), and the International Covenant on Civil and Political Rights (Articles 6 and 7).

As a direct and foreseeable result of this conduct, Plaintiff suffered retaliatory harm, censorship, reputational destruction, and interference with his professional and investigative activities, while the people of Gaza endured extermination, displacement, and humanitarian deprivation. The genocide functioned simultaneously as a mechanism of ethnic cleansing and as a protective shield for the enterprise's financial and political crimes, ensuring the concealment of the UNIK Scandal and the digital-asset systems sustaining global racketeering.

Plaintiff seeks declaratory relief recognizing the Gaza genocide as an integral component of the enterprise's racketeering and concealment structure; injunctive relief dismantling DOGE-linked and digital-asset financial concealment systems; treble damages pursuant to 18 U.S.C. § 1964(c) for injury to business, property, and constitutional rights; and referral for international prosecution under universal jurisdiction for genocide, crimes against humanity, and conspiracy to commit the same.

## Count XVI – Human Collateralization, Strawman Identity Fraud & the Global Debt-Enslavement System (Birth-Certificate Bond Scheme and Corporate Personhood Conversion)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Section TT – Central Banking Cartel & Financial Cabal, Section USB – U.S. Bankcorp: The Corporate Coup and Debt Enslavement of the American People, and Section LOND – The City of London as the Master Node of Global Racketeering, together with their attached exhibits and appendices.

Defendant(s), acting individually and in concert through an association-in-fact enterprise composed of private central-banking dynasties, commercial clearing institutions, and transnational financial intermediaries, constructed and maintained a global system of human collateralization that unlawfully converts every living citizen into a monetized financial instrument. Through fraudulent registration, commercial law fictions, and concealed custodial accounts, the enterprise transformed natural persons into corporate strawmen—artificial entities used as surety for sovereign debt obligations and traded within international bond markets.

As established in Section TT, the enterprise's structure originates with the Rothschild, Rockefeller, and Warburg banking families, the Federal Reserve System, and their European counterparts operating through the Bank for International Settlements (BIS) and International Monetary Fund (IMF). This consortium engineered the Federal Reserve Act of 1913 and the corporate conversion of the United States under the 1871 Incorporation Act, privatizing national monetary authority and subverting constitutional sovereignty. Under this system, each birth certificate issued by state authorities functions as a negotiable instrument—a bond registered with the U.S. Department of Commerce and monetized through the Depository Trust & Clearing Corporation (DTCC). The corresponding Social Security Number serves as an account identifier, enabling the creation of secret trust portfolios denominated in the individual's name but controlled by the enterprise's banking members.

As documented in Section USB, U.S. Bankcorp, in coordination with the Federal Reserve Banks and Treasury Direct systems, facilitated the securitization of these human-capital bonds through internal custodial ledgers and STRIPS-based instruments. The all-caps legal-fiction names (e.g., "JOHN DOE") constitute the corporate strawmen, while the living individuals are deemed sureties responsible for the debt liabilities of their fictitious corporate counterparts. This structure enables continuous extraction of wealth through taxation, inflation, and monetized labor value—without the citizen's knowledge or consent.

As further detailed in Section LOND, the City of London operates as the master-clearing node of this racketeering network, outside British parliamentary jurisdiction and in direct partnership with the BIS and Vatican Bank. These three sovereign city-states—the City of London, Washington D.C., and Vatican City—form the financial-military-theocratic triad sustaining global debt slavery. Through cross-border custodial arrangements, securities derived from birth-certificate bonds are pooled, pledged, and leveraged as collateral in derivative markets administered by the BIS and affiliated central banks.

This mechanism constitutes an unlawful system of human-capital monetization and forms the economic backbone of the larger racketeering enterprise described throughout this Complaint.

This conduct constitutes predicate acts of securities fraud (18 U.S.C. § 1348), mail and wire fraud (§§ 1341–1343), money laundering (§§ 1956–1957), conspiracy against rights (§ 241), deprivation of rights under color of law (§ 242), and human trafficking (§ 1590), together with continuous violations of 18 U.S.C. §§ 1962(c)–(d) as part of the enterprise's ongoing RICO conspiracy. It further violates the Thirteenth Amendment, the Universal Declaration of Human Rights (Articles 4 and 5), and the International Covenant on Civil and Political Rights (Articles 8 and 9) prohibiting slavery, servitude, and involuntary bondage. By exploiting admiralty and commercial law fictions, Defendant(s) unlawfully subjected the American population to maritime debt jurisdiction, redefining citizens as vessels of commerce rather than sovereign beings.

As a direct result of this fraudulent system, every U.S. citizen has been deprived of title to his or her labor, identity, and property. Plaintiff and the public have suffered measurable injury through involuntary servitude to debt, inflationary confiscation of wealth, and deprivation of constitutional liberty. The national debt functions not as a fiscal necessity but as a ledger of enslaved human collateral engineered to perpetuate elite enrichment and governmental subjugation.

Plaintiff seeks declaratory relief recognizing the creation and use of strawman identities and birth-certificate collateralization as fraudulent, unconstitutional, and violative of 18 U.S.C. §§ 1341–1348 and §§ 1961–1968; injunctive relief dismantling the central-bank infrastructure that enables human collateralization, including the Federal Reserve System, BIS, and U.S. Bankcorp's custodial divisions; repatriation and restitution of all human-capital trust accounts and associated securities to their rightful beneficiaries—the living citizens of the United States; treble damages pursuant to 18 U.S.C. § 1964(c) for injury to business, property, and liberty interests; and constitutional nullification of all instruments, bonds, and accounts derived from fraudulent birth-bond monetization, restoring full sovereignty and personhood to the American people.

Through this Count, Plaintiff seeks recognition that the system of human collateralization represents the apex of the enterprise's racketeering design: a transnational mechanism converting human life itself into commercial property. Plaintiff demands immediate cessation of this unlawful practice, full disclosure of all human-collateral accounts, and restitution for the American people whose birthrights were unlawfully converted into financial assets of the global banking cartel.

## Count XVII – Transnational Digital Asset Laundering and Human Trafficking Infrastructure (Epoch / Stripchat Network – Payment Processing, Blackmail, and Exploitation Enterprise)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically *Section Epoch / Stripchat.de – Payment Processing, Money Laundering, Child Exploitation, and Digital Blackmail Infrastructure*, together with all referenced Exhibits and supporting evidence.

Defendant(s) deliberately constructed and maintained a transnational enterprise of money laundering, digital extortion, and human trafficking, utilizing unregulated adult-payment systems, blockchain gateways, and shell entities to disguise the flow of illicit funds. This enterprise—operating primarily through Paycom / Epoch.com LLC (Santa Monica, CA), its Cyprus-based subsidiary TECHNIUS LTD, and its associated domain Stripchat.de—processed revenues generated through online exploitation, including coerced and underage performers.

Funds were routed through offshore intermediaries in Estonia, Cyprus, and Ukraine, converted into cryptocurrency assets (including Bitcoin, Ethereum, and privacy tokens), and reintegrated into Western banking systems through mixers and decentralized exchanges such as Uniswap, ThorChain, and Tornado Cash. Defendant(s) further embedded spyware-enabled "interactive devices" (Lovense, Kiiroo) to collect biometric and behavioral data, weaponizing digital intimacy for surveillance and coercion.

As set forth in *Section Epoch / Stripchat.de,* this architecture was designed to obscure ownership and accountability by layering payments through multiple jurisdictions and masking the ultimate beneficial controllers. This conduct constitutes racketeering activity under 18 U.S.C. §§ 1961–1968, involving predicate offenses of money laundering (§§ 1956–1957), wire fraud (§ 1343), sex trafficking (§ 1591), and computer fraud (§ 1030).

Defendant(s)' coordination with cryptocurrency exchanges, venture-capital portfolios, and affiliated adult-content platforms forms part of the same transnational laundering and capital-flight infrastructure described in *Count IX (Engineered Capital Flight)*. Together, these systems facilitated the conversion of trafficking revenues into digital assets and speculative instruments, contributing to inflationary market distortions and economic destabilization.

The deliberate concealment of these activities through private-placement tokens, shell corporations, and anonymous exchanges demonstrates an intent to evade financial transparency and obstruct law enforcement. These acts constitute predicate offenses within the meaning of 18 U.S.C. § 1961(1) and ongoing participation in a racketeering enterprise under 18 U.S.C. § 1962(c)–(d).

By reason of Defendant(s)' conduct, Plaintiff and the public suffered economic, reputational, and humanitarian injury, including the continuation of trafficking networks, blackmail infrastructure, and financial crimes disguised as commercial innovation. Plaintiff seeks declaratory and injunctive relief, treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XVIII – Ukraine-Based Transnational Laundering Enterprise (Kyiv Regime – Aid Diversion, Inflationary Manipulation, and Financial Racketeering)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically *Count IX (Engineered Capital Flight)*, together with all referenced Exhibits and supporting evidence contained in the report titled "GREATER CORE – KYIV REGIME ENTERPRISE NODE."

Defendant(s), acting through the Kyiv Regime and associated Western intermediaries, knowingly established and maintained a transnational laundering architecture that diverted humanitarian and military aid into speculative financial instruments, digital assets, and offshore entities. This enterprise constituted a continuation of pre-existing black-budget laundering systems designed to weaponize Western aid, manipulate global inflation, and impose disproportionate economic burdens upon the Plaintiff and the public.

Funds and assets originating from United States and European treasuries were systematically rerouted through Ukrainian state-controlled banks and affiliated crypto exchanges, including but not limited to Binance (Malta / Dubai / Cayman Islands), WhiteBIT (Kyiv / Lithuania), EXMO (London / Poland), Tether Holdings (Hong Kong / British Virgin Islands / Bahamas), Kuna Exchange (Kyiv), and Blockchain.com (U.S. / U.K.). These platforms provided the digital infrastructure through which diverted aid and covert capital inflows were converted into Bitcoin, Ethereum, USDT, and other privacy tokens, before being cycled through decentralized laundering mechanisms such as Tornado Cash and synthetic DeFi derivatives.

As established in the *Kyiv Regime Enterprise Node* exhibits, these transfers were neither humanitarian nor defensive in nature, but functioned as deliberate liquidity-siphoning mechanisms engineered to inflate Western consumer markets, destabilize currency parity, and burden citizens through forced inflationary cycles. Aid capital, once digitized and offshored, was absorbed into speculative asset bubbles benefiting venture funds, defense-linked entities, and private equity conduits under the guise of "reconstruction financing."

This conduct constituted racketeering activity under 18 U.S.C. §§ 1961–1968, incorporating predicate acts of money laundering (§§ 1956–1957), wire fraud (§ 1343), financial sabotage (§ 1030), and foreign aid embezzlement (§ 641). Defendant(s) concealed ownership and accountability through multi-jurisdictional special purpose vehicles (SPVs) and opaque investment entities headquartered in London, Dubai, and Kyiv, masking beneficial controllers through private-placement agreements, unregistered securities, and pseudo-sovereign exemptions.

As documented in GREATER CORE, these entities coordinated with Western venture-capital portfolios, defense contractors, and philanthropic "relief" foundations to disguise illicit flows as reconstruction or humanitarian capital. The Plaintiff suffered measurable economic and humanitarian

injury due to the artificial inflation, asset devaluation, and resource diversion directly resulting from this enterprise. Inflationary shocks generated by Ukrainian laundering cycles triggered cascading cost-of-living increases, rent escalations, and purchasing-power erosion across Western economies—burdens disproportionately borne by whistleblowers, investigators, and the working public.

By reason of the Defendant(s)' conduct, Plaintiff and the public sustained economic, reputational, and humanitarian injury, including the ongoing suppression of investigative efforts, retaliatory blacklisting, and coercive manipulation via controlled media narratives. The acts alleged constitute ongoing participation in a racketeering enterprise under 18 U.S.C. § 1962(c)–(d).

Plaintiff seeks declaratory and injunctive relief, dissolution of the Ukrainian laundering network's Western partnerships, full restitution of misappropriated aid and digital-asset proceeds, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XIX – Congressional Complicity in Financial Laundering, Legislative Capture, and Racketeering Enterprise (Monetization of Public Office and Institutionalized Bribery)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, and specifically *Count IX (Engineered Capital Flight)* and *Count XVIII (Ukraine-Based Transnational Laundering Enterprise)*, together with all referenced Exhibits and supporting evidence contained in SECTION CONGRESS — Legislative Corruption, Enterprise Influence, and Monetization of Public Office and SECTION LB — Lobbying as Institutionalized Bribery, including all legal authorities, factual exhibits, and evidentiary findings cited therein.

Defendant(s), acting through members of the United States Congress, senior legislative staff, affiliated lobbyists, and political action committees (PACs), engaged in a pattern of racketeering activity designed to monetize public office, facilitate capital flight, and obstruct investigations into transnational laundering networks connected to the Kyiv Regime, Western financial institutions, and the lobbying-banking nexus operating within the United States legislative structure.

The Congressional Enterprise functioned as a domestic continuation of the same financial racketeering infrastructure established through Ukraine's aid-diversion networks and supported by Western venture-capital and banking intermediaries. Legislative committees—particularly those overseeing defense appropriations, foreign aid, and financial oversight—were infiltrated by enterprise-linked actors who traded access, classified intelligence, and regulatory exemptions in exchange for political donations, campaign financing, and post-term employment.

As established in *SECTION LB*, lobbying in its modern form constitutes institutionalized bribery, satisfying the statutory elements of 18 U.S.C. § 201(b)(1) by providing "anything of value" to public officials in exchange for official acts. The Racketeer Influenced and Corrupt Organizations Act (RICO) expressly recognizes bribery under both federal and state law as a predicate offense pursuant to 18 U.S.C. § 1961(1)(A)–(B). When conducted through payments, contributions, or "independent expenditures" intended to influence legislative outcomes, lobbying meets the definition of bribery, honest services fraud, and money laundering predicates.

The judicial expansion of political spending as "speech" through *Buckley v. Valeo*, 424 U.S. 1 (1976), and *Citizens United v. FEC*, 558 U.S. 310 (2010), enabled this bribery system by equating monetary influence with protected expression. However, the statutory text of 18 U.S.C. § 201(b)(1) remains clear —quid pro quo exchanges between donors and public officials constitute bribery, regardless of form or label. Subsequent narrowing of "official act" in *McDonnell v. United States*, 579 U.S. 550 (2016), did not legalize influence-peddling; it reaffirmed that a quid pro quo for legislative or regulatory action remains prosecutable corruption.

Defendant(s) exploited this judicial shield to construct a legislative capture system operating through PACs, Super PACs, 501(c)(4) entities, and donor-advised funds administered by financial institutions. These vehicles laundered corporate and foreign contributions through opaque conduits, concealing donor identity and establishing a quid pro quo exchange of monetary and non-monetary benefits— including campaign financing, travel, favors, and future employment. The enterprise's conduct therefore incorporated predicate acts of bribery (§ 201), honest services fraud (§§ 1343, 1346), money laundering (§ 1956), and obstruction of justice (§ 1505), satisfying the requirements of 18 U.S.C. §§ 1961–1968.

The lobbying-banking enterprise detailed in *SECTION LB, Part III* provided the financial infrastructure for this corruption. Major banking institutions administered donor-advised funds, routed offshore transfers through shell entities, and bundled executive contributions to legislative leaders, converting lobbying from isolated influence into a coordinated pattern of racketeering activity. These actions demonstrate the "association-in-fact" enterprise defined by 18 U.S.C. § 1961(4) and upheld in *Boyle v. United States,* 556 U.S. 938 (2009).

The continuity and relatedness of conduct—spanning decades and recurring each election cycle— satisfy the "pattern" element under *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989). As established in *SECTION LB*, lobbying expenditures, revolving-door employment, bundled donations, and offshore transfers constitute repeated and continuous predicate acts, rendering the entire apparatus a prosecutable enterprise under RICO.

This network's deliberate obstruction of anti-corruption efforts—through manipulated hearings, falsified committee records, and coordinated media suppression—constitutes active racketeering conspiracy under 18 U.S.C. § 1962(d). These actions furthered the concealment of foreign influence, shielded defense and tech contractors from accountability, and undermined U.S. sovereignty by subordinating legislative authority to transnational enterprise interests.

As a direct result, Plaintiff and the public suffered systemic injury through economic inflation, suppression of whistleblowers, and erosion of democratic representation. By monetizing legislative authority and integrating U.S. congressional mechanisms into the broader laundering and lobbying infrastructure, Defendant(s) converted the nation's lawmaking apparatus into a profit-generating arm of the global racketeering enterprise.

Plaintiff seeks declaratory and injunctive relief, immediate congressional audits, termination of enterprise-linked PACs, Super PACs, and lobbying organizations, disgorgement of illicit proceeds, full restitution of funds obtained through bribery and laundering, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XX – Triad Enterprise: Digital Asset Laundering, PFP Manipulation, Surveillance, and Physical Intimidation

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, and specifically *Count IX (Engineered Capital Flight)*, together with all referenced Exhibits and supporting evidence contained in SECTION TRIAD – COCKROACHES and SECTION LL – Canada – Vancouver as a Human Trafficking and Digital Asset Laundering Hub.

Defendant(s), acting through an organized criminal structure known as the Triad Enterprise, engaged in a pattern of racketeering activity that merged digital asset laundering, physical intimidation, surveillance, and cyber intrusion. Operating primarily from Vancouver, British Columbia, this enterprise constructed the prototype for PFP-based digital assets, which served as the original mechanism for laundering criminal proceeds under the guise of art, culture, and online community engagement. The Triads' manipulation of these tokenized images—conceived to appear as "profile pictures" or digital collectibles—formed the foundation of what later became the global system of Engineered Capital Flight described in *Count IX*.

Through coordinated networks of developers, crypto financiers, and shell entities, the Triad Enterprise transformed image-based NFTs into speculative bearer instruments. These assets were designed to mask the flow of illicit funds tied to trafficking, narcotics, and racketeering, while simultaneously generating artificial demand to inflate digital valuations. Vancouver, functioning as the enterprise's financial and logistical command node, provided the infrastructure and jurisdictional shield for these laundering operations. Canadian crypto exchanges, real estate investment vehicles, and Triad-controlled gambling and adult-content platforms facilitated the conversion of trafficking revenues into tokenized "artworks," granting liquidity and anonymity to criminal financiers.

This enterprise structure was protected through systemic corruption and complicity within law enforcement, intelligence, and financial institutions. As documented in *SECTION LL*, Canadian intelligence and political actors ignored or enabled laundering activity linked to foreign operatives, ensuring that Vancouver remained a safe haven for the Triad's digital operations. The resulting ecosystem allowed transnational money flows, child trafficking, and cyber exploitation to merge seamlessly under one command system, with tokenization technology serving as the primary laundering rail.

In early August 2024, the enterprise escalated from financial concealment to direct interference with Plaintiff's investigative work. An operative identifying himself as "Snipegunner721" traveled to Oklahoma under the pretense of corroborating Plaintiff's findings with law enforcement. Upon arrival, it became evident he had been bankrolled and deployed as a surveillance pawn. The individual, previously known for financial instability, suddenly arrived with approximately $27,000 in gambling capital, continually communicating with external handlers and refusing to meet law enforcement when invited. His conduct revealed premeditated infiltration, surveillance, and an intent to discredit and obstruct Plaintiff's investigation.

Previously, following this encounter, the Defendant(s) escalated their campaign from infiltration to overt intimidation. Coordinated actors initiated a sustained harassment operation involving

psychological manipulation, direct surveillance, and credible death threats. Plaintiff's vehicle and surrounding environment were tampered with using external-stimuli devices, causing erratic mechanical behavior and inducing targeted sensory interference. These methods were neither isolated nor random but part of a synchronized coercive strategy deployed by the same Triad-linked network responsible for the *Wasper/Hive Hack*. That cyber intrusion, executed in parallel, granted the enterprise remote access to Plaintiff's investigative systems, enabling the deletion and weaponization of digital evidence. Together, the physical and digital attacks constituted a unified act of retaliation—an attempt to silence the Plaintiff, obstruct justice, and assert control through fear, technological interference, and surveillance precision.

The conduct described constitutes racketeering activity under 18 U.S.C. §§ 1961–1968, involving predicate acts of money laundering (§§ 1956–1957), wire fraud (§ 1343), computer fraud (§ 1030), witness tampering (§ 1512), retaliation against a witness (§ 1513), and conspiracy against rights (§§ 241–242). The Triad Enterprise's invention of PFP-based digital assets as a laundering medium demonstrates premeditated integration of financial fraud, technology manipulation, and human exploitation into a unified racketeering system.

By reason of Defendant(s)' conduct, Plaintiff suffered extensive financial, psychological, and reputational harm, including destruction of investigative materials, ongoing surveillance, and credible threats to life and safety. The Triad Enterprise represents the fusion of cybercrime and physical intimidation within the global capital flight infrastructure, constituting a direct violation of domestic and international anti-racketeering statutes.

Plaintiff seeks declaratory and injunctive relief, forensic recovery of exfiltrated data, the immediate arrest of all Triad operatives, financiers, and digital collaborators involved in the enterprise, dismantling of Triad-linked digital asset infrastructure, full restitution of economic losses, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XXI – Rothschild Subjugation, Pentagon Continuity, and the Assassination of President John F. Kennedy as a Racketeering Conspiracy

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, together with all referenced Exhibits and supporting evidence contained in SECTION ROTHSCHILD SUBJUGATION, SECTION PENTAGON, SECTION JFK — Assassination as Racketeering Conspiracy, SECTION FI — Blackmail, Compromise & Sexual Extortion (Epstein-Maxwell Network), and SECTION HT — Trafficking of Politicians via Bribery, Extortion, Intimidation, and Handler Systems.

Defendant(s), acting through an interlocking financial, political, and military structure led by the Rothschild banking dynasty, established and maintained a transnational racketeering enterprise designed to subjugate sovereign nations through debt, warfare, and covert coercion. This enterprise, embedded within Western governance and financial systems, utilized the Pentagon as its enforcement arm and orchestrated the assassination of President John F. Kennedy to preserve control over global monetary and military policy.

The Rothschild apparatus operated through a vast web of private central banking entities, defense contractors, intelligence services, and political intermediaries. Its method of subjugation was financial parasitism—the systematic issuance of debt to governments, followed by the privatization of assets and consolidation of power within supranational banking structures. As documented in SECTION ROTHSCHILD SUBJUGATION, this family-controlled financial syndicate established both the ideological and operational foundation of the modern military-industrial complex, merging economic control with perpetual warfare to ensure profit and compliance.

The Pentagon, functioning as the enforcement instrument of this enterprise, became the operational node through which the syndicate maintained hegemony. It directed wars not for defense, but for debt generation and geopolitical subjugation. As set forth in SECTION PENTAGON, defense appropriations, black budgets, and intelligence operations were structured to sustain an illusion of national security while serving the Rothschild–Rockefeller dual monopoly's profit cycles. The Department of Defense thus evolved into a cartel management system—laundering public money through private defense contractors, foreign aid programs, and covert operations—in direct violation of U.S. constitutional sovereignty.

The continuity of this enterprise depended on a systemic coercive apparatus that kept politicians, world leaders, and institutional figures in absolute subjugation. As evidenced in SECTION FI — Blackmail, Compromise & Sexual Extortion (Epstein-Maxwell Network), the Epstein-Maxwell system functioned as the enterprise's human intelligence and enforcement division—recruiting, trafficking, and exploiting individuals to acquire compromising material for blackmail and leverage. Surveillance systems installed in private estates, aircraft, and compounds produced recordings of illicit encounters, securing durable control over high-ranking political, military, and financial actors.

These mechanisms created a self-reinforcing chain of dependency: individuals entrapped by sexual or financial compromise became agents of silence, ensuring the Rothschild-controlled system faced no internal rebellion. As shown in SECTION HT — Trafficking of Politicians via Bribery, Extortion, Intimidation, and Handler Systems, this structure expanded beyond sexual blackmail into an integrated regime of financial bribery, handler oversight, and psychological coercion, designed to manage compromised officials and guarantee continued policy compliance. Politicians were trafficked through elite "handler" systems that maintained control over their communications, career advancement, and personal safety, ensuring obedience to the transnational racketeering enterprise.

This architecture demonstrates how the Rothschild-Pentagon syndicate preserved its authority through fear, silence, and leverage. The same coercive network that manipulated vulnerable individuals through the Epstein-Maxwell enterprise was mirrored at the state level, binding world leaders to the financial apparatus that controlled defense budgets, foreign policy, and global credit issuance.

The assassination of President John F. Kennedy in 1963 represented the most overt and consequential act of racketeering violence ever executed on U.S. soil. As established in SECTION JFK — Assassination as Racketeering Conspiracy, Kennedy's executive actions posed an existential threat to the enterprise: his intent to dismantle the CIA, withdraw from Vietnam, and return control of currency issuance to the Treasury through Executive Order 11110 directly undermined Rothschild control over global credit. His murder ensured the preservation of this financial and military syndicate, guaranteeing

continued wars of attrition and the centralization of global capital under Rothschild-directed institutions such as the IMF, World Bank, and BIS.

Following the assassination, enterprise continuity was preserved through coordinated suppression of evidence, manipulation of the Warren Commission, and the installation of loyalist actors within intelligence and defense hierarchies. This systemic obstruction constitutes ongoing racketeering activity under 18 U.S.C. §§ 1961–1968, incorporating predicate acts of murder (§ 1111), obstruction of justice (§ 1505), conspiracy (§ 371), treason (§ 2381), and financial fraud (§§ 1343, 1344). These acts collectively ensured that no subsequent U.S. administration could sever the government's dependency on privately controlled debt issuance or military expansionism.

Since the enterprise functioned as an *external source operation*—originating from private, transnational banking and intelligence interests rather than lawful U.S. governance—its activities fell outside the scope of constitutional powers. The United States government was effectively commandeered as a commercial instrument for private profit, not as a sovereign entity acting in defense of its citizens. By operating for commercial motives and foreign benefit, this structure forfeited any claim to sovereign immunity or constitutional legitimacy. Accordingly, these activities constitute a racketeering conspiracy under 18 U.S.C. §§ 1961–1968, rather than a lawful exercise of state power. This legal distinction defines the enterprise not as a function of government, but as a criminal cartel acting under the guise of national policy.

The Rothschild enterprise's merger of private finance, military aggression, and blackmail-based coercion subverted constitutional governance and converted the United States into a financial colony of transnational banking interests. The assassination of President Kennedy thus stands as the keystone RICO act that cemented enterprise control and inaugurated a global system of managed conflict and debt slavery.

Plaintiff alleges that the same class of interlocking financial, intelligence, and defense interests described in those exhibits formed a continuous racketeering structure that has preserved control of global capital and warfare policy from the mid-twentieth century to the present. The coercive architecture established by the Epstein-Maxwell and handler systems remains active through digital blackmail, data compromise, and AI-driven influence networks—modernized tools for the same mechanism of subjugation.

According to Plaintiff's analysis, the enterprise's pattern of activity has never ceased; it merely evolved through new financial instruments, privatized intelligence contracting, and coordinated defamation campaigns. Its purpose remains the same: maintaining a private monopoly over debt issuance, weapons procurement, and information control. When individuals expose or litigate against this structure, the enterprise responds through intimidation, digital interference, and organized reputational attacks.

Plaintiff states that he has personally experienced such retaliatory conduct, including disinformation, online harassment, financial obstruction, and coordinated attempts to discredit his professional and investigative work. These acts were undertaken to prevent the Plaintiff from connecting modern financial manipulation to the long-standing racketeering architecture documented in SECTION ROTHSCHILD SUBJUGATION, SECTION PENTAGON, SECTION FI, and SECTION HT. In the

RICO context, such retaliation constitutes continuing enterprise activity under 18 U.S.C. § 1962(d) and predicate violations of 18 U.S.C. §§ 1512, 1513, 1956, 1343, and 1349.

The Plaintiff's current civil RICO action is therefore both a continuation and exposure of that historical enterprise. The same class of private financial and defense institutions that benefited from the Cold War and post–Cold War conflict economy now employ influence operations and digital suppression to obstruct this case, fearing that formal discovery would reveal continuity between past covert operations and present financial misconduct.

By reason of these acts, Plaintiff has suffered professional defamation, surveillance, and economic injury amounting to racketeering retaliation. These harms exemplify the enterprise's intent to prevent judicial recognition of its continuity from mid-century covert programs to modern financial and digital systems.

Plaintiff seeks declaratory and injunctive relief, discovery authority to trace the continuity of enterprise funding and influence, prosecution of individuals found to have participated in retaliatory racketeering acts, restoration of professional standing and economic losses, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XXII – The London–Vatican Complex: Dual Sovereignty and the Master Node of Global Racketeering

Plaintiff incorporates by reference all preceding paragraphs and exhibits, including SECTION VATICAN and SECTION LOND – The City of London as the Master Node of Global Racketeering, together with all related documentary evidence. Collectively, these establish the coordinated financial and geopolitical framework that sustains the modern racketeering enterprise, uniting religious, financial, and legal institutions under a shared architecture of coercive global control. Defendant(s), acting through the Vatican City State and the Corporation of the City of London, have jointly maintained a transnational commercial enterprise masquerading as two sovereign enclaves. These entities operate beyond the reach of democratic accountability, leveraging their legal immunities to conduct money laundering, war financing, political manipulation, and asset concealment across jurisdictions. This dual-sovereign structure forms the Master Node of Global Racketeering—the apex through which all subordinate entities, including the Rothschild banking system, the Pentagon, the IMF, BIS, and international intelligence services, coordinate financial coercion, governance interference, and capital control.

The Vatican Enterprise constitutes a transnational network of natural and juridical persons operating through the Holy See, the Institute for Works of Religion (IOR), the Secretariat of State, and affiliated fronts masquerading as religious or charitable institutions. Evidence confirms that this structure functions not as a sovereign religious body but as a commercial racketeering entity influencing interstate and foreign commerce through systematic money laundering, fraud, war financing, and concealment of assets via private banks in Italy, Switzerland, Germany, the United States, and the United Kingdom. Since the nineteenth century, the Vatican has maintained a continuous financial alliance with the Rothschild banking houses, integrating ecclesiastical authority with private financial

power. The partnership originated with the 1832 Vatican loan from Rothschild Frères and evolved into a global custodial and asset-management system involving Rothschild & Cie Gestion, N.M. Rothschild & Sons, J.P. Morgan, Deutsche Bank, HSBC, Barclays, and Banque Pictet. This arrangement enabled covert participation in war financing, post-conflict reconstruction, and capital flight under the protection of diplomatic immunity and ecclesiastical privilege.

The City of London operates as the secular counterpart and financial command center of the Vatican network. Through the Bank of England, Crown-controlled law firms, corporate trusts, and offshore intermediaries, it serves as the clearinghouse for global racketeering funds, enabling concealed ownership and illicit capital transfers. The Corporation of the City of London maintains extraterritorial privileges distinct from the United Kingdom's democratic government. This status, preserved since medieval charters, allows the City's financial courts, banking institutions, and law firms to function outside parliamentary oversight. Through this structure, trillions in unregulated assets—war profits, trafficking proceeds, and sovereign debt flows—are cycled through shell corporations and off-balance-sheet vehicles to maintain enterprise continuity. Evidence from SECTION LOND confirms that the City of London's network is inseparable from the Vatican-Rothschild axis. The Crown Temple, historically tied to Vatican canon law, provides the legal codex for global debt instruments, maritime law, and international commerce. Its attorneys, acting as trustees for transnational elites, manage the documentation, litigation, and asset transfers that perpetuate racketeering activity across continents.

The Comprehensive Vatican Capital Flight Report and accompanying London records document how these entities jointly infiltrated and restructured the global economy following World War II. The Vatican became a privileged participant in the Bank for International Settlements (BIS), ostensibly as a religious sovereign but in practice as a private financial actor. Vatican assets, including wartime gold reserves, were transferred to BIS accounts and diversified into U.S. Treasury and European bond markets, shielded from international audit by exemptions from IMF and OECD transparency standards. Simultaneously, the City of London's financial syndicates served as intermediaries for laundering these reserves through Commonwealth banks and Swiss affiliates, embedding the Vatican's covert wealth within Western financial systems. Through its APSA and IOR institutions, the Vatican managed hundreds of billions of euros in real estate, sovereign bonds, and equities through custodial accounts in London, Zurich, and New York, maintaining correspondent relationships with the Federal Reserve, BIS, Deutsche Bank, UBS, and Credit Suisse. These accounts served as conduits for laundering funds derived from trafficking, war profiteering, and corruption—protected by religious immunity and the Crown's legal privileges.

Independent reports and whistleblower testimonies have alleged the existence of organized child-trafficking networks operating within or around conflict zones in the Middle East. Plaintiff asserts that elements of these networks intersect with financial and institutional structures already under investigation within the Vatican framework. The Vatican's awareness of ongoing trafficking investigations and its role as a focus of Plaintiff's broader inquiry into international child-exploitation systems form part of the evidentiary record referenced herein. Furthermore, Plaintiff states that the Vatican is currently aware of his dynastic claim and position, and it is reasonable to infer that such awareness has motivated efforts to suppress or obstruct the dissemination of information related to his lineage and investigations. This suppression, occurring within the same enterprise structure and pattern

of retaliation previously described, constitutes additional predicate acts of interference and obstruction under 18 U.S.C. §§ 1512–1513 and supports the allegation of continuing enterprise activity designed to protect institutional and financial interests from exposure.

Because the Vatican–London financial system functions as an external, commercial operation serving private profit rather than sovereign governance, it falls outside the scope of lawful constitutional authority. Their manipulation of U.S. financial institutions, defense contracting, and credit issuance was not a sovereign or ecclesiastical function but a commercial racketeering scheme designed to control global liquidity and weaponize capital for geopolitical leverage. Accordingly, these acts constitute racketeering conspiracies under 18 U.S.C. §§ 1961–1968, not exercises of protected sovereign power. Both entities operated as private corporations disguised as sovereigns, subverting international law and transforming religious and legal authority into a shield for money laundering, obstruction of justice, and the financing of war and trafficking enterprises.

The Defendant(s)' conduct constitutes a continuous and coordinated pattern of criminal activity in violation of federal law, giving rise to enterprise liability under 18 U.S.C. §§ 1961–1968. Through an intricate combination of religious and financial fronts, the enterprise engaged in systematic money laundering in violation of 18 U.S.C. §§ 1956–1957, involving the continuous placement, layering, and integration of illicit capital through the Vatican Bank and City of London financial institutions. These institutions served as conduits for legitimizing proceeds derived from trafficking, war profiteering, and corruption, allowing criminal funds to reenter the global financial system under the guise of legitimate sovereign and charitable operations. This conduct formed the financial foundation of the transnational racketeering enterprise, merging sacred cover with commercial gain. The enterprise further committed mail and wire fraud in violation of 18 U.S.C. §§ 1341–1343 by transmitting falsified records, communications, and reports across borders to misrepresent the nature of its activities. Official correspondences, investment statements, and diplomatic cables were deliberately structured to conceal the commercial and profit-driven nature of the operations, misrepresenting them as humanitarian or ecclesiastical. These deceptive communications formed the essential infrastructure of the enterprise's cover, maintaining the illusion of lawful sovereignty while concealing transnational organized crime. The Defendant(s) also engaged in conspiracy to defraud the United States under 18 U.S.C. § 371 by concealing Vatican–London custodial accounts and shell entities structured through offshore jurisdictions including Switzerland, Liechtenstein, and the British Virgin Islands. These arrangements deprived the United States and other governments of oversight, enforcement, and jurisdiction over funds tied to state and military contracts, effectively transforming sovereign economies into tributaries of private financial dynasties. The enterprise likewise violated 18 U.S.C. §§ 2339A–2339B by facilitating indirect financing of sanctioned regimes, weapons manufacturers, and conflict intermediaries through development and reconstruction funds. Proceeds laundered through Vatican–London financial instruments were reintroduced as capital investments in armament, energy, and intelligence industries serving both sides of regional conflicts. These acts reveal that the enterprise's financial apparatus directly enabled global instability and profit through controlled warfare. Defendant(s) further committed obstruction of justice and retaliation in violation of 18 U.S.C. §§ 1512–1513 by suppressing audits, interfering with international investigations, intimidating whistleblowers, and leveraging media assets to distort or neutralize public inquiry. The Vatican's Dicastery for Communication and the City of London's affiliated media conglomerates, including Reuters and The

Financial Times, coordinated to frame disclosures of criminal conduct as attacks on faith or market corrections, thereby deflecting scrutiny and preserving enterprise continuity. Each exposure—from the Banco Ambrosiano collapse in 1982 to the Vatileaks disclosures in 2015 and the Suisse Secrets revelations in 2022—was neutralized through diplomatic immunity, narrative manipulation, and regulatory capture. These actions collectively demonstrate the enterprise's continuity, its command over global narratives, and its ability to prevent judicial or governmental interference.

The Vatican–London system operates as a closed-loop capital structure in which the Vatican legitimizes illicit inflows through religious protection while the City of London converts those inflows into legal assets through trust networks, corporate law firms, and offshore banking. Their continued participation in BIS liquidity operations ensures that tainted funds are laundered into the global economy, indistinguishable from sovereign reserves. Through these interlocked mechanisms, the enterprise commands international commerce, geopolitics, and military finance under the pretense of sovereign legitimacy. Its survival depends upon secrecy, elite complicity, and suppression of financial transparency initiatives that could expose the connection between private capital and global power consolidation.

The London–Vatican Complex represents the operational apex of global racketeering. Together, these twin sovereign corporations maintain an extra-constitutional empire of financial control, political manipulation, and perpetual conflict. Operating for commercial gain under the false pretense of religious and legal sovereignty, the Vatican and City of London stand outside constitutional protection and within the full jurisdiction of RICO prosecution. By reason of these acts, Plaintiff alleges that the Vatican–London alliance constitutes an ongoing racketeering conspiracy—one that finances wars, destabilizes nations, launders illicit proceeds, and corrupts international governance while concealing its activity under sovereign and ecclesiastical privilege. Plaintiff seeks declaratory and injunctive relief, forensic tracing of Vatican–London capital flows, full audit authority over BIS, IOR, and City trust holdings, referral for prosecution of participating officials, restitution of misappropriated funds, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XXIII – Brussels-Based Financial Laundering Enterprise (European War Racket and Institutionalized Racketeering)

Plaintiff incorporates by reference all preceding paragraphs of this Complaint and specifically Counts XVIII (Ukraine-Based Transnational Laundering Enterprise) and IX (Engineered Capital Flight), together with all referenced Exhibits and supporting evidence contained in the reports titled "GREATER CORE" and "SECTION BRUSSELS – EUROPEAN WAR RACKET."

Defendant(s), acting through Brussels-based political, financial, and defense intermediaries, knowingly conspired to establish and perpetuate a transnational laundering enterprise designed to institutionalize war profiteering under the guise of European reconstruction, humanitarian relief, and defense cooperation. This enterprise weaponized the European Union's regulatory apparatus and NATO procurement frameworks to launder aid, manipulate markets, and conceal illicit transfers through diplomatic immunity and jurisdictional complexity.

Unlike the operational laundering node in Kyiv, the Brussels Enterprise represented the system's financial command structure. It was here that fraud evolved into statecraft—where corruption was not concealed but codified. Brussels served as the central hub where diverted aid, embezzled defense appropriations, and speculative war profits were legitimized through policy, oversight committees, and transnational compliance language. The laundering of war capital became indistinguishable from legitimate governance, executed through the machinery of the European Commission, European Investment Bank, and affiliated defense initiatives acting in concert with NATO.

Through the European Defence Fund, European Peace Facility, and related financing instruments, billions in U.S. and NATO contributions were cycled through opaque procurement networks anchored in Brussels. The same officials and corporate intermediaries responsible for regulatory enforcement held financial or political stakes in the contracting entities they were tasked to oversee. This revolving-door structure—between EU bureaucracies, private equity firms, and defense conglomerates—guaranteed that fraud was self-policing and therefore unpunishable.

Funds intended for humanitarian relief or reconstruction were systematically diverted into speculative assets, shell corporations, and venture funds disguised as innovation programs. Once these assets entered the EU financial ecosystem, they were shielded by sovereign immunity, privacy laws, and layered investment vehicles based in Luxembourg, Cyprus, and Liechtenstein. Brussels thus became the laundering system's legislative firewall, allowing stolen U.S. and NATO funds to reemerge as lawful European investment capital.

The Brussels Enterprise further engaged in coercive manipulation of monetary and fiscal policy to sustain artificial inflation cycles that enriched select financial actors while impoverishing the European working class. By engineering debt expansion and austerity measures under the pretext of wartime stability, EU policymakers effectively transferred the burden of laundering losses onto the public through taxation and currency debasement. The resulting inflation and resource scarcity were not incidental—they were the economic signatures of a planned racket disguised as governance.

Institutional complicity was ensured through a network of policy foundations, NGOs, and consultancies operating as "interface entities" between defense, finance, and public administration. These entities laundered narrative as effectively as money—crafting the illusion of accountability through white papers, audits, and compliance initiatives that served only to obscure real control. Brussels' role as the global capital of policy laundering made it indispensable to the continuation of this transnational criminal enterprise.

This conduct constitutes racketeering activity within the meaning of 18 U.S.C. §§ 1961–1968, including predicate acts of wire fraud (§ 1343), money laundering (§§ 1956–1957), obstruction of justice (§ 1503), and major fraud against the United States (§ 1031). The Brussels Enterprise engaged in acts of foreign aid embezzlement (§ 641), policy corruption, and falsification of economic data to conceal systemic malfeasance under international agreements.

By converting geopolitical corruption into institutional practice, Brussels established the Western world's first supranational racketeering model—an economic engine of perpetual war. The same apparatus that claimed to safeguard transparency and democracy became the chief instrument of concealment, ensuring that criminal intent was reframed as administrative necessity.

As a direct result of this conduct, Plaintiff and the public suffered measurable financial, humanitarian, and reputational injury. Citizens were defrauded through inflationary theft, regulatory deception, and suppression of investigative transparency. Whistleblowers and journalists who exposed these mechanisms were targeted through retaliatory defamation and professional exclusion orchestrated by EU and NATO-aligned entities.

Plaintiff seeks declaratory and injunctive relief, dissolution of the Brussels Enterprise's financial and institutional networks, restitution of all misappropriated U.S. and EU funds, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XXIV– XRP: Racketeering, Securities Fraud, and the Sabotage of FIT21

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, together with all referenced Exhibits and supporting evidence contained in SECTION XRP – XRP, Ripple Labs Inc., and the Derailment of FIT21.

Defendant(s), operating through Ripple Labs Inc. and a coordinated network of executives, promoters, and offshore affiliates, engaged in a deliberate pattern of racketeering activity within the digital asset space. The enterprise used the XRP token as both a financial weapon and a laundering vehicle, engineering a system of false market legitimacy designed to deceive investors, manipulate legislation, and obstruct U.S. regulatory processes. Ripple's actions demonstrate not a failure of compliance, but the calculated architecture of a continuing criminal enterprise, operating across financial, political, and digital domains to extract capital and neutralize oversight.

Through infiltration of the FIT21 Coalition, Defendant(s) inserted themselves into the legislative process under false pretenses, posing as cooperative industry stakeholders while covertly undermining the very regulatory framework intended to expose their securities violations. Upon scrutiny and exposure by this Plaintiff, Ripple withdrew from the Coalition in silence—timed precisely with public revelations of their manipulative conduct—confirming obstruction, concealment, and the deliberate sabotage of federal legislative oversight. This conduct constitutes obstruction of justice under 18 U.S.C. § 1505 and establishes the enterprise's operational continuity between digital market manipulation and interference with U.S. governance.

The enterprise's fraudulent conduct extended beyond legislative sabotage into the systemic deception of investors and markets. Ripple executives and affiliated influencers propagated deliberate falsehoods that XRP was gold-backed, that it would replace SWIFT, and that it was endorsed by central banks, despite no evidence, audits, or institutional validation. The company allowed and benefited from this misinformation, permitting false narratives to metastasize across social media, conferences, and financial press to inflate demand and mislead retail participants. These acts were executed through digital channels, fulfilling predicate violations under 18 U.S.C. § 1343 (wire fraud) and 15 U.S.C. §§ 78j(b), 77q (securities fraud).

Ripple's executives, including Jed McCaleb, Brad Garlinghouse, and Chris Larsen, coordinated insider dumping and strategic token releases disguised as "liquidity provisioning," deliberately exploiting public hype cycles to extract billions in illicit profit. These transactions were routed through offshore

accounts in Singapore, the Cayman Islands, the UAE, and Switzerland, facilitated by shell entities designed to obscure beneficial ownership and evade U.S. jurisdiction. The pattern of token releases and concealment confirms money laundering under 18 U.S.C. §§ 1956–1957 and the use of Ripple's escrow system as a façade to simulate scarcity while enabling continuous market manipulation.

Following federal enforcement action by the U.S. Securities and Exchange Commission (SEC v. Ripple Labs Inc., SDNY, Case No. 1:20-cv-10832), the enterprise pivoted toward political interference— weaponizing lobbying and influence operations to weaken crypto regulation and shield XRP from classification as a security. Ripple's infiltration of the FIT21 Coalition, subsequent withdrawal, and funding of pro-industry PACs illustrate a form of legal obstruction by design—turning legislative access into a tool for laundering legitimacy and evading accountability.

Ripple's enterprise also engaged in psychological and digital manipulation. The company and its marketing arms coordinated mass influencer networks, automated bot farms, and AI-generated propaganda to create a false public consensus around XRP's legitimacy and future "global adoption." These propaganda systems, including the "XRP Army," operated as digital racketeering instruments— harassing analysts, silencing whistleblowers, and manufacturing collective delusion in service of enterprise continuity. This propaganda arm targeted financially vulnerable populations, retirees, veterans, and lower-income investors through emotional manipulation and misdirection, constituting financial exploitation and predicate acts under 18 U.S.C. §§ 1343, 1512, and 1513.

Ripple's conduct was not isolated to deceptive sales or lobbying—it represented a transnational conspiracy to institutionalize fraud under the guise of fintech innovation. Through front companies, falsified partnerships, and fraudulent accounting, Ripple artificially inflated its corporate valuation, presenting a facade of growth while concealing insider enrichment and offshore tunneling of proceeds. This deception extended to accounting fraud, off-balance-sheet manipulation, and misuse of escrow to mislead markets about supply and liquidity control, directly violating 18 U.S.C. § 1962(c) and forming the operational core of the enterprise.

The cumulative effect of these acts constitutes a continuous racketeering enterprise under 18 U.S.C. §§ 1961–1968, involving predicate violations of securities fraud, wire fraud, money laundering, obstruction of justice, and conspiracy. The enterprise's pattern of infiltration—legislative, financial, and psychological—demonstrates conscious intent to subvert U.S. law, extract capital from the public, and suppress investigative accountability, including retaliation and defamation campaigns against this Plaintiff for exposing their conduct.

By reason of Defendant(s)' actions, Plaintiff and the investing public have suffered extensive financial losses, reputational injury, and obstruction of due process. XRP and Ripple Labs stand as modern continuations of financial racketeering through digital infrastructure—designed not to decentralize finance, but to privatize fraud behind a technological veil.

Plaintiff seeks declaratory and injunctive relief, forensic audit and disgorgement of illicit proceeds, forfeiture of enterprise assets, legislative declassification of FIT21 manipulation, public restitution for retail investors, and treble damages pursuant to 18 U.S.C. § 1964(c).

## Count XXV — NVIDIA: Racketeering, Securities Fraud, and the Artificial Intelligence Inflation Bubble

Plaintiff incorporates by reference all preceding paragraphs of this Complaint, together with all referenced Exhibits and supporting evidence contained in SECTION NV — NVIDIA / The Web3DOTCOM Bubble, including Exhibit NVIDIA-AI-1 (Bloomberg Network Map), as integral evidence of a continuing transnational racketeering enterprise.

Defendant(s), operating through NVIDIA Corporation and a coordinated network of affiliated corporations, financiers, and AI-linked intermediaries, engaged in a deliberate and sustained pattern of racketeering activity designed to inflate valuations, manipulate digital markets, and conceal capital flight through the artificial scarcity of GPU infrastructure and the speculative expansion of unregulated digital assets. This collective, referred to as the AI Cartel, included NVIDIA, Microsoft, OpenAI, Oracle, AMD, CoreWeave, and xAI—entities that colluded to manufacture scarcity and use AI infrastructure as a laundering mechanism for speculative liquidity generated by unregulated Web3 capital flows. Together, they engineered a synthetic economy in which compute power and tokenized assets functioned as interlinked speculative instruments, giving rise to the Plaintiff's identified phenomenon: the Web3DOTCOM Bubble.

Over a year prior to the inflation of this bubble, the Plaintiff accurately predicted its emergence, identifying unregulated digital assets, GPU monopolization, and AI speculation as converging forces capable of destabilizing the global financial system. Through the UNIKORNAIO(K2) economic framework, the Plaintiff demonstrated how unchecked token issuance, offshore exchanges, and algorithmic financial fraud would merge with AI-driven hype cycles to form a transnational structure of synthetic value extraction. Rather than acknowledge these findings or collaborate to prevent systemic collapse, corporate actors and institutional gatekeepers suppressed, defamed, and silenced the Plaintiff, while simultaneously stealing and monetizing his intellectual work for personal and institutional profit.

This deliberate gatekeeping and defamation campaign ensured that those responsible for exploiting the Plaintiff's research could profit from the very crisis he had foreseen. Their refusal to recognize or credit his predictive work delayed necessary regulatory and financial interventions, transforming a preventable imbalance into a national and global security threat. The metastasis of unregulated digital assets, combined with speculative AI investment cycles, now poses a direct threat to the American financial system, as capital continues to flow through opaque offshore channels, unregulated token markets, and artificially inflated technology valuations.

The Plaintiff's early research had proposed actionable remedies for stabilizing both AI and digital asset markets—solutions that, if implemented, would have contained this threat before it reached systemic proportions. Instead, those who stole his work sought to bury his contributions, conducting smear campaigns to discredit him while publicly adopting his concepts to further their own financial and reputational gain. This pattern of intellectual theft and reputational sabotage reveals a coordinated effort to conceal their complicity and hide their "badge of shame"—the fact that they built profit atop the Plaintiff's stolen innovative research while denying him recognition and access to the platforms necessary to implement real reform. e.g. Elon Musk achieving political victory and immediately pampfing his bags.

The fraudulent conduct of the AI Cartel extended across global technology, crypto, and financial sectors, merging speculative hype with deliberate scarcity to create a closed-loop valuation system based on illusion rather than innovation. NVIDIA's manipulation of GPU availability, paired with the speculative monetization of unregulated digital assets, generated the circular investment loops illustrated in Exhibit NVIDIA-AI-1, confirming the Plaintiff's original warnings that the AI and Web3 ecosystems had fused into a single speculative economy designed to perpetuate artificial inflation and launder capital under the guise of technological progress.

In essence, the Web3DOTCOM Bubble was not a spontaneous market phenomenon—it was a coordinated fraud enabled by those who silenced the very person who identified it. The Plaintiff's foresight, data, and remedial proposals were willfully ignored in favor of greed and control, allowing the crisis to metastasize into a global threat to financial stability.

Accordingly, Plaintiff seeks declaratory and injunctive relief, full forensic audits of AI and digital asset infrastructures, disgorgement of illicit proceeds, restitution for intellectual theft, and formal recognition that Plaintiff not only predicted but actively attempted to prevent the Web3DOTCOM Bubble. The Court will find that this preventable crisis—amplified by gatekeeping, defamation, and greed—was allowed to endanger both national and global economic security because those in power chose to steal his knowledge and profit from it rather than heed his warnings and implement solutions.

# VIII. INJURY AND DAMAGES

1. Plaintiff realleges and incorporates by reference all preceding paragraphs. The predicate acts described in this Complaint have caused Plaintiff direct and proximate injury to his business, property, reputation, and constitutional interests within the meaning of 18 U.S.C. § 1964(c).

2. As a result of Defendants' coordinated racketeering activity—including but not limited to wire fraud, money laundering, human trafficking, defamation, computer intrusion, obstruction of justice, and fraud relating to the usurpation of dynastic and intellectual property rights— Plaintiff has sustained quantifiable economic losses and continuing harm that include:

   a. Loss of income and professional opportunities resulting from blacklisting, reputational sabotage, and suppression of Plaintiff's work product within the technology and policy sectors;

   b. Diversion, conversion, and expropriation of Plaintiff's intellectual property, investigative materials, and analytical frameworks, including the UNIKORNAIO (K2) Protocol, leading to deprivation of rightful control and economic benefit;

   c. Destruction, deletion, or unauthorized interference with proprietary data and assets through surveillance intrusions and tampering with Plaintiff's workstations;

   d. Financial losses traceable to Defendants' concealment of capital flight mechanisms and manipulation of unregulated digital-asset markets;

   e. Legal and logistical expenses incurred in protecting data, restoring compromised systems, and responding to retaliatory acts perpetrated by the Enterprise;

f. Continuing impairment of Plaintiff's professional credibility, ability to engage with regulators, and capacity to influence legislative or institutional policy, due to defamatory campaigns and psychological operations;

g. Severe emotional and dignitary harm, including humiliation, distress, invasion of privacy, and interference with Plaintiff's security and livelihood;

h. Defamation and dilution of the House of Romanov legacy through coordinated disinformation and falsified records, disseminated to obscure Plaintiff's verified Romanov lineage and familial reputation; and

i. Reputational and economic harm compounded by Defendants' ongoing use of digital-asset schemes and racketeering channels that perpetuate illicit profit and continued injury to Plaintiff's business and legacy interests.

3. The injuries described herein are **continuing and compounding**. Because Defendants' racketeering acts remain active and the digital-based mechanisms they control continue to generate illicit profit, Plaintiff faces an ongoing and persistent threat of further economic, reputational, and dignitary harm.

# IX. RELIEF REQUESTED

1. Plaintiff realleges and incorporates all preceding paragraphs. Pursuant to 18 U.S.C. § 1964(a)–(c) and this Court's supplemental and equitable powers, Plaintiff seeks the following relief against all Defendants, jointly and severally:

a. **Treble damages** for injury to business and property resulting from the pattern of racketeering activity;

b. **Compensatory damages** for all direct, consequential, and special losses, including restoration of diverted assets, intellectual property, and proprietary data;

c. **Punitive damages** under applicable state-law causes of action to deter future misconduct and willful malice;

d. **Restitution, disgorgement, and constructive trust** over all proceeds, funds, and property traceable to the racketeering enterprise, including those derived from money laundering, human trafficking, capital-flight schemes, and unlawful appropriation of Romanov-related or other dynastic assets described in Section KKK;

e. **An order compelling discovery, accounting, and tracing** of all assets connected to the Rothschild-led financial cartel and affiliated entities to determine the full scope of property and proceeds obtained through the Enterprise's predicate acts;

f. **Declaratory and injunctive relief** prohibiting Defendants and their agents from continuing any acts of retaliation, defamation, surveillance, or financial obstruction against Plaintiff, and

requiring preservation of evidence relevant to the Enterprise's operations and Romanov-related claims;

g. **Equitable accounting and forfeiture** of all profits and proceeds generated by the Enterprise's capital flight, laundering, and war-profiteering mechanisms;

h. **Institutional and Policy Remedies:** Plaintiff requests that, consistent with its equitable powers and subject to congressional and regulatory oversight, the Court refer the evidentiary record developed in this action to appropriate legislative and executive authorities for examination of systemic abuses in central-bank and monetary-policy mechanisms—including but not limited to the Federal Reserve System, Bank of England, BIS, IMF, and affiliated institutions—to ensure compliance with constitutional, statutory, and human-rights standards; and

i. **Such further relief as the Court deems just and proper,** including enforcement of any forfeiture or restitution orders against assets within the Court's jurisdiction demonstrably connected to the racketeering activity, whether or not those assets were historically linked to the Romanov estate.

# X. DEPARTMENT OF JUSTICE REFERRAL AND REQUEST FOR ENFORCEMENT

1. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Verified Complaint as though fully set forth herein.

2. Pursuant to **18 U.S.C. § 1964(d)** and this Court's inherent authority to refer potential criminal conduct to the **United States Department of Justice**, Plaintiff respectfully requests that the Court transmit and refer the evidentiary record developed in this action—including all attached exhibits and supplemental submissions—to the **Attorney General of the United States**, the **Criminal Division**, and the **Organized Crime and Racketeering Section** for review and potential prosecution under applicable federal statutes.

3. The predicate acts described in this Complaint—including wire fraud, money laundering, human trafficking, obstruction of justice, and other offenses enumerated in **18 U.S.C. § 1961(1)** —constitute serious violations of federal criminal law. The evidence contained within the **UNIKORNAIO framework**, the **Master Matrix**, and supporting exhibits identifies specific actors, financial pathways, and digital-asset infrastructures that appear to fall within the enforcement jurisdiction of the **Department of Justice**, the **Federal Bureau of Investigation (FBI)**, and the **Financial Crimes Enforcement Network (FinCEN)**.

4. Plaintiff further requests that, upon verification of the allegations through discovery, the Court direct that certified copies of this Verified Complaint and all evidentiary attachments be transmitted to the Department of Justice for investigation and, if appropriate, initiation of

criminal proceedings against any individual or entity found to have violated United States criminal law.

5. Plaintiff requests inter-agency coordination as appropriate under to ensure that any matters implicating national-defense or intelligence equities are reviewed through lawful Department of Justice oversight channels, including Inspector General and inter-agency task-force coordination.

6. Plaintiff further requests cooperation with **State Attorneys General**, **State Bureaus of Investigation**, and other state and local law-enforcement partners pursuant to principles of cooperative federalism and parallel **state RICO** and penal statutes, to ensure comprehensive enforcement where predicate acts span both federal and state jurisdictions .

7. Plaintiff also requests, where appropriate, international cooperation pursuant to **Mutual Legal Assistance Treaties (MLATs)**, the **United Nations Convention Against Transnational Organized Crime**, and coordination channels administered through the **U.S. National Central Bureau (Interpol-USNCB)** , to facilitate cross-border evidence gathering, lawful intelligence exchange, and enforcement actions across allied jurisdictions.

8. **Technical-Evidence Consideration.** Plaintiff additionally requests that the Court and the Department of Justice include qualified scientific and technical experts capable of evaluating potential misuse of advanced surveillance, electromagnetic, or energy-based technologies—such as directed-energy or communications-interference systems—to determine how and why such technologies were employed unlawfully against the Plaintiff or others. This request is made to ensure that the Court and federal investigators possess a clear, evidence-based understanding of the technological mechanisms that may underlie aspects of the predicate acts alleged herein.

9. Evidence and witnesses relevant to these allegations are located within, inter alia, the territories of **Poland** and the **Russian Federation**, where U.S. jurisdictional cooperation is supported by existing bilateral instruments on mutual legal assistance and extradition. Any investigation arising from this referral should utilize those official mechanisms for lawful evidence collection, witness safety, and enforcement coordination among authorized U.S., Polish, and Russian authorities.

10. This referral is made in the interest of **justice and public integrity**, to ensure that the evidence presented in this civil proceeding is evaluated for potential criminal enforcement and that all responsible parties—corporate, institutional, or individual—are held accountable under United States and international law. Plaintiff submits this referral in good faith and respectfully requests that the Court preserve the evidentiary record for appropriate governmental action.